[No. S039738. Mar. 23, 1998.]

TIMOTHY CURRAN, Plaintiff and Appellant, v.
MOUNT DIABLO COUNCIL OF THE BOY SCOUTS OF AMERICA,
Defendant and Appellant.

**COUNSEL**

Jon W. Davidson, Mark D. Rosenbaum, Paul L. Hoffman, Richard H. Green, Beatrice Dohrn, Mei Lin Kwan-Gett and Taylor Flynn for Plaintiff and Appellant.

Eisen & Johnston, Jay-Allen Eisen, Marian M. Johnston, Karen Leaf, Ann Perrin Farina, Hedges & Caldwell, Mary Newcombe, Ian L. Kramer,

Morrison & Foerster and Dennis M. Perluss as Amici Curiae on behalf of Plaintiff and Appellant.

Hughes, Hubbard & Reed, George A. Davidson, Carla A. Kerr, John Kralick IV and Lois Moonitz Jacobs for Defendant and Appellant.

Paul A. Hoffman as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**GEORGE, C. J.**—Plaintiff is a former Eagle Scout whose application to become an assistant scoutmaster was rejected by defendant, a regional council of the Boy Scouts of America, after plaintiff publicly stated that he is a homosexual and publicly expressed his commitment to communicating to others his view as to the acceptability and morality of homosexuality, a view defendant maintains conflicts with its official position that homosexuality is immoral. Plaintiff unsuccessfully sought an injunction prohibiting defendant from rejecting his application.

We emphasize at the outset that the resolution of this matter does not turn on our personal views of the wisdom or morality of the actions or policies that are challenged in this case. Instead, this case presents two legal issues: First, does defendant, in acting to admit or exclude members, come within the definition of those entities—i.e., "all business establishments of every kind whatsoever"—covered by California's public accommodation statute (Civ. Code, § 51, commonly known as the Unruh Civil Rights Act)?[1] Second, if defendant's membership decisions are subject to the Unruh Civil Rights Act, would enforcement of the statute, so as to prohibit defendant from rejecting plaintiff's application for the position of assistant scoutmaster, violate defendant's (or its members') right of association under the First and Fourteenth Amendments of the federal Constitution?

After conducting a bifurcated trial on these two issues, the trial court concluded that (1) under the applicable judicial precedents interpreting the Unruh Civil Rights Act, defendant is a type of organization whose membership decisions are covered by the Act, but (2) application of the Act to prohibit defendant from rejecting plaintiff for the position of assistant scoutmaster would violate defendant's members' federal constitutional right of expressive association. Accordingly, the trial court entered judgment in favor of defendant.

---

[1] For convenience and to minimize repetition, we hereafter refer to this statute as either the Unruh Civil Rights Act or simply the Act.

On appeal, the Court of Appeal, in a two-to-one decision, affirmed the judgment rendered by the trial court, agreeing with that court's determination that application of the Unruh Civil Rights Act to preclude defendant from rejecting plaintiff's application would violate the members' federal constitutional right of association. Contrary to the conclusion reached by the trial court, however, the Court of Appeal majority also determined that defendant does not fall within the category of "business establishments" subject to the Act, and held that judgment in favor of defendant was sustainable on this ground as well. The dissenting Court of Appeal justice disagreed with the majority's conclusion on both issues and concluded that the trial court's judgment in favor of defendant should be reversed.

In a second decision—*Randall* v. *Orange County Council*—filed almost contemporaneously with the appellate court's decision in the present case, the Court of Appeal in another district, ruling in a case arising out of the exclusion of two 9-year-old Cub Scouts from scouting because of their refusal to affirm a belief in God, held that a regional council of the Boy Scouts is an organization whose membership decisions come within the Unruh Civil Rights Act, and affirmed a trial court judgment rendered against the council based upon a violation of the Act.

In light of the conflict in the Court of Appeal decisions on the question whether the membership decisions of local affiliates of the Boy Scouts generally are subject to the provisions of the Unruh Civil Rights Act, as well as the potential importance of the issues relating to the constitutional right of association, we granted review in both matters.

For the reasons discussed below, we conclude that, with regard to its membership policies and decisions, defendant does not fall within the category of "business establishments" as that language is used in the Unruh Civil Rights Act. As we shall explain, the Boy Scouts differs in a number of significant respects from each of the entities that previously has been found to be subject to the Act, and we conclude that neither the language of the Act, its legislative history, nor the reasoning of past California decisions applying the Act supports plaintiff's argument that the Boy Scouts properly should be considered a business establishment whose membership decisions are subject to the statute. Because our conclusion on this statutory issue is sufficient to resolve the matter, we have no occasion to address defendant's further claim that enforcement of the Act to require it to accept plaintiff's application would violate its constitutional right of association under the First and Fourteenth Amendments.

Accordingly, we conclude that the judgment of the Court of Appeal in favor of defendant should be affirmed.

I

From 1975 to 1979, when he was 14 to 18 years of age, plaintiff Timothy Curran was a member of a Boy Scout troop (Troop 37) within the jurisdiction of defendant Mount Diablo Council of the Boy Scouts of America (Mt. Diablo Council). During that period, plaintiff attained the rank of Eagle Scout, the highest rank a Boy Scout can reach. In addition to becoming an Eagle Scout, plaintiff received numerous other scouting honors, being selected to participate in a troop leadership development program run by defendant, elected by his troop to two honor camping organizations, and chosen as one of only thirty-five scouts from defendant's district (which included more than thirteen thousand five hundred scouts) to attend the Boy Scouts of America National Jamboree in 1977. At that jamboree, plaintiff received practical training in journalism through work on scouting publications, and was encouraged by one of the adult leaders in the journalism program to participate again at a subsequent jamboree. Under the applicable policies of the Boy Scouts, plaintiff remained a member of Troop 37 until his 18th birthday, October 29, 1979. After that date, although plaintiff no longer was an official member of the Boy Scouts, he apparently continued to have contact with, and to participate in some of the activities of, Troop 37.

During the summer of 1980, between June 29, 1980, and July 1, 1980, the Oakland Tribune published a three-part article on gay teenagers in the San Francisco Bay Area, based upon interviews with more than twenty teenagers who openly identified themselves as gay. Plaintiff was one of the teenagers who agreed to be interviewed for the article.

The first installment of the Oakland Tribune article began with a description of how, several years earlier, when plaintiff was 16 years of age, he first had told his parents that he was gay, and reported his parents' supportive reaction to his disclosure. The article commented that "Curran was better equipped for the confrontation [with his parents] than a lot of gay teenagers. He had a gay social life apart from life at school, and he was starting to get involved with the active gay youth underground in the Bay Area. In a little more than a year, he'd be calling himself a gay youth activist. And his parents were trying hard to understand."

The third installment of the article reported that in May 1980 plaintiff had attended his high school senior prom with a male date, and quoted plaintiff's own description and explanation of the event. The article stated: "Several months earlier, Curran had decided that the prom was the place to come out to the people at school: 'The way I saw it,' Curran says, 'I wanted to go to my prom. I wanted to go with someone I liked. I didn't want to go with a

girl, and I wasn't about to listen to the tyranny of the majority saying, "You're ruining our prom." It was just as much my prom as it was theirs.' [¶] 'But I had another, nobler reason. I thought it was about time some of these people opened their eyes. If you look at [Dr. Alfred] Kinsey's statistics, it would follow that there'd be a lot of other gay young men and women there who were going with dates of the opposite sex. It would be doing *them* good to see someone at the prom who was proud of being gay—someone who didn't just say it, but who acted on it.' " (Bracketed material in quoted article.) The article also explained that "Curran had agreed beforehand, at the request of the school principal, that he and [his date] wouldn't dance slow dances, and that they wouldn't 'openly display affection.' " Finally, the article noted that Curran said that when he returned to school on the Monday following the prom, " 'it was business—believe it or not—as usual.' " Nothing in the article mentioned Curran's former membership in or relationship to the Boy Scouts.

Quentin Alexander, the executive director of defendant Mt. Diablo Council, testified that a number of persons brought the Oakland Tribune article to his attention. He stated that after reading the article and "knowing that Tim had been active at one time in scouting," he asked another council executive to determine whether plaintiff was still active in the program. Alexander stated that when he was informed that plaintiff no longer was active, "we took no further action."

Shortly thereafter, plaintiff submitted an application to defendant council seeking authorization to attend the 1981 Boy Scouts of America National Jamboree. Alexander testified that when the council's jamboree committee initially received plaintiff's application, the council attempted to ascertain in what troop within the district plaintiff currently was registered as an active member, but could not find plaintiff's name on the membership list of either of the two troops plaintiff had listed. Alexander testified that shortly after the district sent a letter to plaintiff indicating that his application could not be approved, he (Alexander) received a telephone call from plaintiff—who then was attending college in Los Angeles—inquiring about the status of the application.

In that conversation, Alexander told plaintiff that he was ineligible to attend the jamboree because he no longer was a registered member of the scouts; only those adults who had been admitted as "scouters"—adult scoutmasters or assistant scoutmasters—were eligible to attend the national jamboree. When plaintiff responded that "in that case, I will file an application," Alexander told him: "Tim, I think we need to set an appointment to discuss this, but we can't accept that application." When plaintiff asked "is it

because of my homosexuality?", Alexander responded, "Yes, it is. But we need to set an appointment when you're back here and we'll discuss it at that time." Plaintiff agreed to meet with Alexander.

The meeting was held on November 28, 1980.[2] At trial, both plaintiff and Alexander agreed in substance as to what had occurred at the meeting. Plaintiff testified that Alexander gave plaintiff a copy of the Oakland Tribune article and asked "if [plaintiff] espoused that lifestyle still." When plaintiff told Alexander that he did, Alexander indicated that he could not accept plaintiff's application and explained the procedure for appealing the decision. Alexander also testified that plaintiff stated at the meeting that "he specifically wanted to [be in the scouts]—because he so firmly believed personally in a homosexual lifestyle that there was, quote, not anything wrong with it, and he wanted to make sure that other kids understood that."

Thereafter, plaintiff sought review of defendant's decision by the Western Region of the Boy Scouts of America, the next higher level in the Boy Scouts hierarchy. In response, counsel for the Boy Scouts informed plaintiff of the Boy Scouts' willingness to conduct a hearing on his appeal, but that such a hearing would be pointless unless plaintiff "believes there is some misunderstanding of underlying facts." The letter stated that "[o]nly if [plaintiff] now contends, and hopes to prove, that the facts previously provided by him are untrue could a hearing be productive."

Following receipt of this letter, plaintiff filed the present action against defendant, alleging, among other matters, that defendant's rejection of his application to become an assistant scoutmaster violated the Unruh Civil Rights Act. The trial court sustained defendant's demurrer without leave to amend and dismissed the action. In the initial appeal in this matter, the Court of Appeal reversed the judgment and concluded that, on the basis of the allegations contained in the amended complaint, plaintiff had stated a cause of action under the Unruh Civil Rights Act. (*Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712 [195 Cal.Rptr. 325, 38 A.L.R.4th 607] (*Curran I*).) The Court of Appeal remanded the matter for further proceedings before the trial court.

Upon remand, plaintiff filed a motion for summary judgment and, in the alternative, for summary adjudication of issues under the then applicable provisions of Code of Civil Procedure section 437c, subdivision (f). The superior court denied summary judgment but ruled that a number of issues were without substantial controversy, including that "[p]laintiff was refused

---

[2] In addition to Alexander and plaintiff, the meeting was attended by plaintiff's parents, plaintiff's former scoutmaster, and the president of the Mt. Diablo Council.

admission by [d]efendant as Adult Member or 'Scouter,' because he was a homosexual," that "[t]he policy and practice of [d]efendant is that no homosexual may be an adult member of the Boy Scouts of America," that "[p]laintiff's homosexuality was the only reason for [d]efendant's refusal to admit him as an Adult Member," and that "[d]efendant will not admit any homosexual into membership regardless of such person's qualifications and will dismiss homosexuals from membership if it becomes aware of the member's homosexuality."

Due to a series of events, including a stay of the action pending the United States Supreme Court's consideration and determination of related issues in *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club* (1987) 481 U.S. 537 [107 S.Ct. 1940, 95 L.Ed.2d 474] (*Rotary Club*), the trial in this matter did not begin until September 1990.[3] At that time, pursuant to a stipulation of the parties and court order, the trial was bifurcated and the trial court conducted the first phase of the trial, which was limited to the issue whether defendant is a type of organization—"all business establishments of every kind whatsoever"—covered by the Unruh Civil Rights Act.

At the outset of the first phase of the trial, the trial court rejected plaintiff's contention that under the law of the case doctrine, the Court of Appeal's prior decision in *Curran I, supra*, 147 Cal.App.3d 712, conclusively established that defendant was a business establishment for purposes of the Act; the trial court permitted both parties to introduce evidence and present argument with regard to that issue. On the basis of the evidence presented, and the existing case law interpreting the term "business establishment" as used in the Unruh Civil Rights Act, however, the trial court nonetheless concluded that defendant is a business establishment for purposes of the Act and thus falls within the "regulatory ambit" of the Act.

In reaching this conclusion, the court relied upon a variety of circumstances relating both to the Boy Scouts in general and to the specific attributes and operations of defendant Mt. Diablo Council. The evidence established that the activities and objectives of the Boy Scouts are primarily educational (in the broadest sense) and recreational. In this regard, the Official Scoutmaster Handbook states that "[e]very Boy Scout activity and design strives toward the three aims of Boy Scouting: (1) building character, (2) fostering citizenship, and (3) developing mental, moral, and physical fitness." Further, the evidence established that membership in the Boy

---

[3]After the stay pending the decision in *Rotary Club, supra*, 481 U.S. 537, was lifted, the initial judge to whom the case was assigned retired, and thereafter the second judge to whom it was assigned was elevated to the Court of Appeal. The case then was reassigned to the judge before whom the case ultimately was tried.

Scouts is governed by the policies of the national Boy Scouts of America, and by design is inclusive rather than exclusive. Any boy between the ages of 11 and 18 years who expresses his willingness to abide by the Boy Scout Oath can become a Boy Scout upon making application and paying a nominal fee and annual dues. Scouts and scouters are actively recruited, and membership is open to all regardless of race or ethnic background. A Boy Scouts of America publication explicitly states that "[n]either the charter nor the bylaws of the Boy Scouts of America permits the exclusion of any boy. The National Council and Executive Board [of the Boy Scouts of America] have always taken the position that Scouting should be made available for all boys who meet entrance age requirements."

With respect to defendant Mt. Diablo Council, the trial court found that the council is a California nonprofit corporation chartered by the National Council of the Boy Scouts of America to oversee, facilitate, and administer the provision of an effective scouting program within the council's geographic area. There are approximately 13,500 scouts (in approximately 145 troops and packs) and 5,000 adult members within the jurisdiction of the council. Defendant owns and maintains a large physical plant, which includes a central administrative building and four camps, and also maintains and operates a summer camp facility leased from the National Forest Service.[4] It has a paid staff of 22 full-time, year-round employees (11 professional and 11 clerical and other nonprofessional) and 30 summer employees, and an annual budget in excess of $1.7 million. It operates a small retail Boy Scout shop, sells T-shirts and patches bearing its name, and participates in the selection and sale of Boy Scouts of America uniforms, equipment, publications, and other official scouting paraphernalia.

The trial court also found that the council "engages in regular fund-raising activities, such as the annual Scout-A-Rama, the annual Sports Breakfast, and special events such as golf tournaments and auctions, to which the general public is invited," and that it publicizes these events in the local media. Further, the council interacts extensively with the local community, recruiting and chartering the organizations that sponsor local troops from

---

[4]Although the national Boy Scouts of America is a federal nonprofit corporation established by Congress (see 36 U.S.C. §§ 21-29) and the records in the cases before us indicate that local affiliates frequently lease or are otherwise permitted to use publicly owned property for scouting activities, there is no claim before us that defendant's relationship with governmental entities is such as to render its action—in rejecting plaintiff's application for the position of assistant scoutmaster—"state action" for constitutional purposes. Accordingly, we have no occasion to address that issue. Similarly, there is no claim that the federal charter of the Boy Scouts of America exempts that organization, or its local affiliates, from the requirements imposed by state law upon organizations that operate within a state. (Cf. *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 90, fn. 21 [219 Cal.Rptr. 150, 707 P.2d 212].)

local churches, labor unions, and civic organizations such as the Rotary Club, and recruiting members for its executive board from among the officers or management of prominent local businesses. Finally, the court noted that scouts themselves also are highly visible in the community, because the organization encourages scouts to wear their scout uniforms when they are participating in various public service projects and fund-raising activities within the community.

In the course of its decision in the first phase of the trial, the trial court explicitly acknowledged that "Mt. Diablo Council differs in significant respects from the other nonprofit organizations that have been held to constitute 'business establishments' under the Unruh [Civil Rights] Act," noting that defendant "has no substantial, or even significant, business purpose" and that "[t]he goals of the scouting program are predominantly expressive." Further, the trial court recognized that "[t]he benefits which the scouts and scouters receive from participation in the program are over-whelmingly personal and non-economic" and that "scouting activities take place principally in small, intimate, primary groups where the relationships among the members can be characterized as continuous, close and personal." Finally, the court observed that "[u]nlike the [Boys'] Club in *Isbister* [v. *Boys' Club of Santa Cruz, Inc., supra,* 40 Cal.3d 72], Mt. Diablo Council is not a single purpose organization operating a traditional 'public accommo-dation,' " explaining that although the council does own recreational facili-ties, "their operation is not the Council's 'principal activity and reason for existence' as the [Boys'] Club's provision of gym and pool facilities was" and the facilities "are not used on a casual, drop-in basis as . . . the facilities in *Isbister* . . . were."

Although the trial court thus recognized that "[t]he circumstances of this case do not fall squarely within the fact patterns of the cases that have been decided to date," the court nonetheless concluded that "[d]efendant's public orientation and prominence in the community rightfully place it within the regulatory ambit of the Unruh [Civil Rights] Act. The public nature of the context in which discrimination occurs is a factor of overriding importance in assessing the interests served by regulation under the Act. The psycho-logical injury to the individual is greater the more public the place or the circumstances of the discrimination. And Society's interest in preventing discrimination increases as the context in which it is practiced carries with it a greater suggestion of social tolerance or even acceptance. [Citation.] As plaintiff eloquently points out here: 'Finding that [d]efendant is not a business establishment under Unruh would endorse a "right" to discriminate on the part of an organization serving a unique position in our society. The Boy Scouts stands for what is best in American values. . . . To rule that no

legal principle requires that it not discriminate on the basis of race, religion, ancestry, national origin, sex, physical disability, sexual orientation, or any other arbitrary basis would send a stark message about what the ideals of this country really mean, a message that is not true.' "

Finally, although acknowledging that "Mt. Diablo Council unquestionably has legitimate interests, as an expressive association, in being able to define its own mission and to adopt membership policies which enable it to achieve that mission," the court noted that "[d]efendant's position [in the first phase of the trial], that it should not be subject to regulation under the Unruh [Civil Rights] Act because it is an expressive association, would mean that it could discriminate on any grounds and for any reason. A boy who was excluded from participating in the Scouts because of his race or religion, or because he was a homosexual, would have no opportunity to challenge the basis for his exclusion. Given the state's interest in eradicating invidious discrimination, the court concludes that it is appropriate that an organization of the size, non-selectivity, and visibility of Mt. Diablo Council be put to the burden of establishing the required nexus between its exclusionary policies and its expressive purpose."

Having concluded in the first phase of the trial that defendant properly could and should be considered a business establishment for purposes of the Unruh Civil Rights Act, the court went forward with the second phase of the bifurcated trial, which, by stipulation of the parties, was directed to an issue raised by defendant as an "affirmative defense," namely whether application of the Unruh Civil Rights Act—so as to preclude defendant from rejecting plaintiff as a scout leader—would violate its members' constitutional rights of intimate or expressive association. After setting forth the basic facts surrounding defendant's rejection of plaintiff's application (which we have summarized above), and observing that "[i]t is undisputed that Mr. Curran's request to become a Scouter was rejected on the basis of the written policy which Mt. Diablo Council follows of excluding 'avowed' or 'known' homosexuals from adult leadership positions,"[5] the court proceeded to determine whether an order prohibiting defendant from rejecting plaintiff's application

---

[5]Although the trial court referred to the policy of excluding "avowed" or "known" homosexuals from adult leadership positions, the court explained that "[w]hile the court and counsel have loosely referred to the validity of this policy, such is an imprecise formulation of the issue before the court. Plaintiff is not suing for injunctive or declaratory relief with respect to this policy. Rather, he is now alleging only a violation of the Unruh [Civil Rights] Act, and the issue in Phase II is whether application of the Unruh [Civil Rights] Act to preclude the defendant from excluding the plaintiff as a Scoutmaster, under the circumstances of this case, violates its members' constitutional rights."

The "written policy" to which the trial court referred was apparently a 1983 statement by the Legal Counsel of the Boy Scouts of America that declared: "Avowed or known homosexuals are not permitted to register in the Boy Scouts of America. Membership in the

would violate the members' constitutional right of either intimate or expressive association.

With respect to the right of intimate association, the trial court concluded that in light of the findings it had made in the first phase with regard to "the organization's size, the non-selectivity of its membership, and its public orientation and prominence within the community," defendant had failed to establish a violation of its members' right to intimate association. With respect to the right of expressive association, however, the court concluded that defendant had made the required showing to establish that application of the Unruh Civil Rights Act to prohibit defendant from excluding plaintiff as an adult leader would violate the members' right to expressive association.

In reaching its conclusion with regard to the right of expressive association, the trial court first determined that the activities in which the Boy Scouts is engaged, "and upon which application of the Unruh [Civil Rights] Act would impact," are "overwhelmingly expressive." The court noted that "[a]lthough Scouting focuses on camping and outdoor skills, this is the means to an end." Quoting from Boy Scout publications, the court found that the organization's mission is "to serve others by helping to instill values in young people and in other ways prepare them to make ethical choices over their lifetime in achieving their full potential." Although recognizing that "[t]he fact . . . an organization is engaged in expressive activities does not . . . necessarily mean that any exclusionary policy it might adopt is protected by the first amendment right to expressive association" and that "[a] nexus must be shown between the basis for the exclusion and the belief system which defines the organization," the trial court went on to conclude that the required nexus was present here.

The court found in this regard that the values the Boy Scouts seeks to instill are grounded in the Boy Scout Oath and Law, that sexual morality is addressed in the Boy Scout Oath and Law under the rubric of "morally straight" and "clean;"[6] and, finally, that although "[n]ot a great deal is explicitly spelled out in the Scout literature . . . regarding sexuality in general or homosexuality in particular," the evidence introduced at trial demonstrated "that the Boy Scouts of America as an organization has taken

organization is a privilege, not a right, and the Boy Scouts of America has determined that homosexuality and Scouting are not compatible. No units will be chartered to known homosexual groups or individuals."

[6]The Boy Scout Oath states: "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight." The Boy Scout Law provides that a scout is "trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."

a consistent position that homosexuality is immoral and incompatible with the Boy Scout Oath and Law" and that "this is the view that is communicated whenever the issue comes up." In reaching this latter determination, the court relied on various policy statements that had been issued on the subject by the national organization,[7] and on the testimony of numerous national and local Boy Scout leaders who testified to the organization's long-held and consistent view as to the immorality of homosexual conduct and its incompatibility with the Boy Scout Oath and Law.[8] Although plaintiff presented several witnesses who testified that they were unaware that the Boy Scouts or Mt. Diablo Council took a position against homosexuality, the trial court pointed out that "no witness testified that he or she understood homosexuality to be consistent with the Scout Oath and Law and that the Boy Scouts so regarded it."[9] On this record, the trial court concluded that "the evidence introduced in this case establishes the required nexus between the basis for the exclusion and the belief system which defines the organization."

[7] In addition to the 1983 statement of the legal counsel quoted above (*ante*, pp. 680-681, fn. 5), defendant introduced a memorandum written in 1978 by the national Boy Scouts of America setting forth—in question and answer form—the official position of the Boy Scouts relating to homosexuality and scouting. The document states in relevant part: "Q. May an individual who openly declares himself to be a homosexual be a volunteer Scout leader? A. No. The Boy Scouts of America is a private, membership organization and leadership therein is a privilege and not a right. We do not believe that homosexuality and leadership in Scouting are appropriate. We will continue to select only those who in our judgment meet our standards and qualifications for leadership. [¶] Q. May an individual who openly declares himself to be a homosexual be a registered unit member? A. No. As the Boy Scouts of America is a private, membership organization, participation in the program is a privilege and not a right. We do not feel that membership of such individuals is in the best interests of Scouting."

[8] At trial, the national director of public relations for the Boy Scouts of America testified that it has been understood clearly since the incorporation of the Boy Scouts early in this century that homosexual conduct is immoral and inconsistent with the Scout Oath. He and other witnesses testified that the terms "morally straight" and "clean" have been in use in the Scout Oath and Law from the early 1900's when it would have been clearly understood that homosexual conduct was considered immoral (and illegal), and that the words continue to be interpreted by the Boy Scouts of America as rendering homosexual conduct unacceptable today. In addition, several witnesses testified that adult leaders routinely are trained to inform boys that homosexuality is not "morally straight."

[9] A number of witnesses called by plaintiff testified that they had spent years in plaintiff's Boy Scout troop as members or as scoutmasters and never had been informed that homosexual conduct was not "morally straight" or "clean," and that they were unaware this was part of the Boy Scouts' message. Plaintiff also elicited evidence acknowledging that although scouting literature is replete with moral and ethical pronouncements, none of the written material that is distributed to the Boy Scouts themselves (as contrasted with the training handbook provided to scout leaders) speaks specifically to the issue of homosexuality or homosexual conduct. Finally, plaintiff presented written materials, published by the Boy Scouts, indicating that scoutmasters are not expected to instruct scouts in a formal manner on sexual matters or family life—although the same text noted that scoutmasters should answer questions or provide advice on these topics if requested.

Further, the trial court pointed out that in determining the impact of enforcement of the Unruh Civil Rights Act upon the right of expressive association, it was important to take into account "the position of leadership which a Scoutmaster occupies in the Scouting program . . . ." As the court explained: "In any organization, the leader occupies a sensitive role with respect to the articulation and transmittal of the group's values. This is particularly true of the Boy Scouts. The Scouting program is organized around the principle that the most effective way to teach the values of Scouting is through the leadership, counseling and example of the Scoutmaster."

On the basis of the foregoing evidence, the trial court concluded that defendant had established "that forced inclusion of a Scout Leader who has publicly acknowledged his or her homosexuality and has expressed beliefs contrary to the Boys Scouts' view regarding the immorality of homosexuality, as the evidence shows plaintiff has, would substantially impact the defendant's ability to get across its preferred message in its preferred way." Emphasizing that "[t]he issue, of course, is not whether the defendant's view is correct, or enlightened, or even best calculated to achieve the organization's broader goals," the trial court observed that "[t]he issue is simply whether application of the Unruh [Civil Rights] Act here would substantially interfere with Mt. Diablo Council's ability to achieve its expressive goals," and concluded that application of the Act in these circumstances would constitute such an interference. The court explained: "Inclusion of a homosexual Scoutmaster who has publicly acknowledged his or her homosexuality and expressed beliefs in conflict with those of the Boy Scouts on this issue would either undermine the force of the Boy Scout view that homosexuality is immoral and inconsistent with the Scout Oath and Law, or would undermine the credibility of the Scoutmaster who attempts to communicate that view."

In light of the conclusion it reached in the second phase of the trial—that application of the Unruh Civil Rights Act, to require defendant to accept plaintiff's application for assistant scoutmaster, would violate the members' federal constitutional right of expressive association—the trial court entered judgment in favor of defendant.

Plaintiff appealed from the judgment in favor of defendant, and defendant appealed from the trial court's determinations that it was a business establishment within the meaning of the Unruh Civil Rights Act and that application of the Act would not violate the constitutional right of intimate association.

As noted, the Court of Appeal, in a divided decision, affirmed the judgment rendered by the trial court in favor of defendant. The majority

opinion in the Court of Appeal agreed with the trial court's conclusion that application of the Unruh Civil Rights Act—to prohibit defendant from rejecting plaintiff for the position of assistant scoutmaster—improperly would impinge upon the members' right of expressive association. The opinion further concluded that the trial court should have ruled in favor of defendant on two additional grounds: (1) application of the Act to defendant would violate the right of intimate association (as well as the right of expressive association), and (2) contrary to the finding of the trial court, defendant is not a business establishment for purposes of the Unruh Civil Rights Act, and thus the statutory restrictions on discrimination embodied in the Act do not apply to "scouting groups."

The dissenting justice in the Court of Appeal disagreed with the majority opinion on all issues, concluding that defendant is a business establishment within the meaning of the Unruh Civil Rights Act, and that prohibiting defendant from rejecting plaintiff's application for a leadership position on the basis of his homosexuality would not violate either the members' right of expressive association or their right of intimate association.

We granted review to address the significant issues presented by this case.[10]

---

[10]Preliminarily, we note that although neither of the parties has raised the point, the court has received a letter expressing concern that the court may have a potential conflict of interest or at least the appearance of such a conflict in this case and in *Randall* v. *Orange County Council* (1998) 17 Cal.4th 736 [72 Cal.Rptr.2d 453, 952 P.2d 261], as a result of the court's adoption of the Code of Judicial Ethics, effective January 15, 1996, which contains a provision barring a judge from holding membership in any organization that practices invidious discrimination on the basis of "race, sex, religion, national origin, or sexual orientation," and also contains an exception for membership in a "nonprofit youth organization." (See Cal. Code Jud. Ethics, canon 2C.) For several reasons, we believe it is clear that no conflict of interest or reasonable appearance of such a conflict exists. First, the issue to which canon 2C is directed (whether a judge should be precluded as an ethical matter from participating in a given organization) is totally distinct from the issues presented in these cases (whether a specific statute [the Unruh Civil Rights Act] applies to the membership decisions of the Boy Scouts, and, if applicable, whether the Act constitutionally may be applied to prohibit the organization from excluding a would-be adult or youth member under particular circumstances). Second, even if the court's action in adopting the code were to have reflected a legal conclusion on an issue relevant to these proceedings, the adoption of the code still would not give rise to a conflict of interest that would affect the justices' participation in these cases. Courts routinely are called upon to apply, modify, or reconsider prior legal determinations in subsequent litigation, and a judge's participation in a prior decision involving a related legal issue has not been viewed as creating a conflict of interest or providing a basis for recusal in the later proceeding. (See *Liteky* v. *United States* (1994) 510 U.S. 540, 551, 555-556 [114 S.Ct. 1147, 1157-1158, 127 L.Ed.2d 474]; see generally, Shaman et al., Judicial Conduct and Ethics (2d ed. 1995) § 4.04, pp. 101-102.) Accordingly, the court's adoption of the Code of Judicial Ethics provides no basis for questioning the propriety of the justices' participation in these cases.

## II

We turn first to the principal question of statutory interpretation presented, namely whether defendant constitutes a business establishment whose membership policies and decisions are subject to the Unruh Civil Rights Act. The statute reads in relevant part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in *all business establishments of every kind whatsoever.*" (Civ. Code, § 51, italics added.)

## A

At the outset, we reject plaintiff's contention that, under the law of the case doctrine (see generally, 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 895-916, pp. 928-953 and cases cited), defendant's status as a business establishment whose membership decisions are subject to the Unruh Civil Rights Act is definitively established for purposes of this proceeding by virtue of the Court of Appeal decision in *Curran I, supra,* 147 Cal.App.3d 712. As the trial court observed on remand, although the decision in *Curran I* concluded that the allegations in the amended complaint were sufficient to state a cause of action under the Unruh Civil Rights Act, a number of the allegations contained in the complaint concerning defendant's attributes and activities were not borne out by the evidence introduced at trial,[11] and substantial additional evidence relating to defendant's activities, not referred to in the complaint, also was brought forth at trial. Under these circumstances, we believe the trial court was correct in concluding that its consideration of the question whether defendant constitutes a business establishment whose membership decisions are subject to the Act was not foreclosed by the law of the case doctrine. (See, e.g., *Otten* v. *Spreckels* (1920) 183 Cal. 252, 254 [191 P. 11]; *Foley* v. *Northern Calif. P. Co.* (1913) 165 Cal. 103, 106-107 [130 P. 1183]; see generally, 9 Witkin, Cal. Procedure, *supra,* Appeal, § 908, pp. 943-944.)

Similarly, the issue whether the membership decisions of the Boy Scouts are subject to the Unruh Civil Rights Act has not been resolved definitively

---

[11]Thus, for example, although *Curran I* noted that the complaint alleged that "membership in the Boy Scouts of America is of considerable financial value to its members in admission to institutions of higher learning, in employment, and in advancement in the business world" (147 Cal.App.3d at p. 718), from the evidence presented at trial the trial court found that participation in scouting does not enhance "a Boy Scout's chances of getting into the college of his choice or of advancing in his chosen career to a greater extent than participation in any activity that can be included in a resume would. The evidence does not establish that boys join the scouts for any kind of financial reward."

by prior decisions of this court. In *Isbister* v. *Boys' Club of Santa Cruz, Inc.*, *supra*, 40 Cal.3d 72, this court took note of the then recent Court of Appeal decision in *Curran I* (40 Cal.3d at p. 81, fn. 8), but did not approve or endorse that ruling, instead specifically "reserv[ing] judgment as to whether *any* organization or entity serving a substantial segment of the public on a nonselective basis is a 'business establishment' within the Act's meaning." (*Ibid.*, original italics; see also *id.* at pp. 84, fn. 14, 91.)

Accordingly, the specific issue whether the Boy Scouts is a "business establishment" whose membership decisions are subject to the Act has not been resolved by past decisions.[12] Nonetheless, in determining this issue we properly are guided, of course, both by the language and legislative history of the Unruh Civil Rights Act, and by the principles set forth in prior California decisions construing the Act.

### B

We most recently addressed the question of the proper interpretation of the term "business establishment" as used in the Unruh Civil Rights Act in *Warfield* v. *Peninsula Golf & Country Club* (1995) 10 Cal.4th 594 [42 Cal.Rptr.2d 50, 896 P.2d 776] (*Warfield*). In addressing this issue in *Warfield*, we began by summarizing the origin and background of this legislation, and we believe it is helpful briefly to reiterate that history here.

As we explained in *Warfield*, "[a]fter the United States Supreme Court, in the *Civil Rights Cases* (1883) 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835], invalidated the first federal public accommodation statute, California joined a number of states in enacting its own initial public accommodation statute, the statutory predecessor of the current version of section 51. (Stats. 1897, ch. 108, § 2, p. 137.) Expanding upon the limited category of 'public service enterprises' to which the early common law doctrine applied, the 1897 statute, as amended in 1919 and 1923, provided that '[a]ll citizens within the jurisdiction of this state are entitled to the full and equal accommodations,

---

[12]In a related argument, plaintiff, relying upon the Legislature's failure to enact a number of bills that were introduced to overrule the Court of Appeal's decision in *Curran I, supra*, 147 Cal.App.3d 712, contends that such legislative inaction should be interpreted as demonstrating the Legislature's acquiesence in the conclusion that the Unruh Civil Rights Act applies to the membership decisions of the Boy Scouts. We cannot agree. As we have seen, the decision in *Curran I* was simply a ruling on a pleading issue and did not constitute a holding that the membership decisions of the Boy Scouts are subject to the Unruh Civil Rights Act. Further, this court's decision in *Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d 72, made it clear that this court had reserved judgment on the question of the applicability of the Act to the membership decisions of the Boy Scouts. Under these circumstances, the Legislature's failure to enact the proposed bills cited by plaintiff cannot properly be viewed as a legislative resolution of the issue now before us.

advantages, facilities and privileges of inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens.' (Stats. 1923, ch. 235, § 1, p. 485.) Thus, the 1897 statute, by its terms, specifically granted the right to 'full and equal accommodations, advantages, facilities and privileges' in a number of specifically designated enterprises, as well as in 'all other places of public accommodation or amusement.' " (*Warfield, supra,* 10 Cal.4th at pp. 607-608.)

As we further explained in *Warfield*: "In 1959, in apparent response to a number of appellate court decisions that had concluded that the then-existing public accommodation statute did not apply to the refusal of a private cemetery, a dentist's office, and a private school to make their facilities available to African-American patrons (see *Long* v. *Mountain View Cemetery Assn.* (1955) 130 Cal.App.2d 328 [278 P.2d 945]; *Coleman* v. *Middlestaff* (1957) 147 Cal.App.2d Supp. 833 [305 P.2d 1020]; *Reed* v. *Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887 [338 P.2d 633]), the Legislature undertook, through the enactment of the Unruh Civil Rights Act, to revise and expand the scope of the then-existing version of section 51. *As initially introduced,* the bill that ultimately was enacted into law proposed to revise the first paragraph of section 51 to provide: 'All citizens within the jurisdiction of this State, no matter what their race, color, religion, ancestry, or national origin, are entitled to the full and equal *admittance,* accommodations, advantages, facilities, *membership, and privileges in,* or accorded by, *all public or private groups, organizations, associations,* business establishments, school, and public facilities; to purchase real property; and to obtain the services of any professional person, group, or association.' [Citation.] Thereafter, the bill underwent a series of amendments in both houses of the Legislature.[13] As ultimately enacted in 1959, the relevant paragraph of section 51 provided: 'All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national

---

[13]The footnote in *Warfield* appearing at this point states: "The complete progression of the bill through the Legislature is set forth in detail in Horowitz, *The 1959 California Equal Rights in 'Business Establishments' Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 265-270.)" (10 Cal.4th at p. 608, fn. 8.)

Although in *Warfield* we did not describe in detail all of the numerous amendments that were proposed and later deleted as part of the legislative drafting process, we note that at one point the bill was amended specifically to apply to "the charitable benefits administered or offered by any organization or institution receiving any tax advantage or exemption . . ." but that this language was deleted in a later stage of the drafting process. (See Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 265-270 & fns. 33, 34, 35, & 36.)

origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in *all business establishments of every kind whatsoever.*' [Citation.] In subsequent years, this paragraph of section 51 was amended to add 'sex' and 'disability' to the specified categories of prohibited discrimination [citations], but the paragraph otherwise has not been altered." (*Warfield, supra*, 10 Cal.4th at pp. 608-609, all italics added in *Warfield*.)

After briefly summarizing the origin and legislative history of the Unruh Civil Rights Act, we went on in *Warfield* to review three prior California Supreme Court cases—*Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313] (*Burks*), *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427] (*O'Connor*), and *Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d 72 (*Isbister*)—that specifically had considered the question whether a particular entity fell within the reach of the Act. Because of the significance of those decisions for the resolution of the present case, we believe it is appropriate to review them, as well as the decision in *Warfield*, in some detail.

*Burks, supra*, 57 Cal.2d 463, handed down in 1962, was the first decision of this court to address the proper application of the Unruh Civil Rights Act. In *Burks*, the plaintiffs alleged that the defendant real estate developer was violating the Unruh Civil Rights Act by engaging in racial discrimination in the sale of tract homes. The defendant in *Burks* contended that it should not be subject to the Act on a number of grounds. First, the defendant—noting that unlike the ordinary places of public accommodation or amusement covered by the earlier public accommodation statute, it had no fixed place of business—argued that it was not a "business establishment" to which the Act applied. Second, the defendant pointed out that although the initial version of the bill that ultimately was enacted into law had referred specifically to the right "to purchase real property" and to obtain "professional" services among the activities to which the statutory prohibitions applied, those specific references were eliminated in the version of the legislation that ultimately was enacted into law. The defendant contended that the exclusion of those terms in the final enactment evidenced a legislative intent not to cover its activities.

In *Burks, supra*, 57 Cal.2d 463, this court rejected both of those contentions. With regard to the first claim, the court emphasized that the legislation, as enacted, applies to " 'all business establishments of every kind whatsoever,' " language indicating that the Legislature intended the term "business establishments" to be interpreted in the "broadest sense reasonably

possible." (*Id.* at p. 468.) As the court explained: "The Legislature used the words 'all' and 'of every kind whatsoever' in referring to business establishments covered by the Unruh Act (Civ. Code, § 51), and the inclusion of those words, without any exception and without specification of particular kinds of enterprises, leaves no doubt that that term 'business establishments' was used in the broadest sense reasonably possible. The word 'business' embraces everything about which one can be employed, and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain.' [Citations.] The word 'establishment,' as broadly defined, includes not only a fixed location, such as the 'place where one is permanently fixed for residence or business,' but also a permanent 'commercial force or organization' or 'a permanent settled position (as in life or business).' [Citations.]" (*Id.* at pp. 468-469.) The court in *Burks* concluded that "[i]t is clear that defendants operated 'business establishments' within the meaning of the term as used in the Unruh Act." (*Id.* at p. 469.)

With regard to the second claim, the court in *Burks* noted that although the final version of the bill did not include the references to the right "to purchase real property" and to obtain "professional" services that had been included in the initial version of the bill, "[t]hese deletions can be explained on the ground that the Legislature deemed specific references mere surplusage, unnecessary in view of the broad language of the act as finally passed." (57 Cal.2d at p. 469.) The court pointed out, in this regard, "that in the original bill the general term 'business establishments' was not, as now, followed by the words 'of every kind whatsoever' and that those words were added in the draft that deleted the specific reference to the purchase of real property." (*Ibid.*)

Accordingly, the court in *Burks* held that the defendant real estate developer in that case was clearly subject to the Unruh Civil Rights Act.

The question of the proper interpretation and application of the "business establishments" clause of the Unruh Civil Rights Act again came before this court in 1983, in *O'Connor, supra,* 33 Cal.3d 790. A year earlier, the court had determined, in the case of *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161] (*Marina Point*), that the Unruh Civil Rights Act generally prohibits an apartment complex from excluding would-be residents on the basis of their age or the age of their children. The issue before the court in *O'Connor* was whether the holding in *Marina Point* applied to a similar age-restriction policy embodied in the "covenants, conditions and restrictions" of a condominium development that were enforced by a nonprofit homeowners association—

the Village Green Owners Association—whose membership consisted of all of the owners of condominium units within the development.

The homeowners association maintained in *O'Connor* that the holding in *Marina Point* was inapplicable to its actions or regulations because it was not a business establishment within the meaning of the Unruh Civil Rights Act. In support of its position, the defendant emphasized that it was a nonprofit association of private homeowners and not a traditional business establishment.

The court in *O'Connor* rejected the defendant's contention and concluded that the defendant properly should be considered a "business establishment" for purposes of the Unruh Civil Rights Act. In reaching this conclusion, the court first determined that the nonprofit nature of the defendant was not controlling, explaining that "[n]othing in the language or history of [the Unruh Civil Rights Act] calls for excluding an organization from its scope simply because it is nonprofit. [Citation.] Indeed, hospitals are often non-profit organizations, and they are clearly business establishments to the extent that they employ a vast array of persons, care for an extensive physical plant and charge substantial fees to those who use the facilities." (33 Cal.3d at p. 796.)

After concluding that its nonprofit status did not demonstrate that the homeowners association was not a business establishment for purposes of the Act, the court in *O'Connor* went on to examine the specific activities engaged in by the association and concluded that its responsibilities were comparable to those of a landlord and were undertaken for the purpose of enhancing the value of the property of the members of the association.[14] Under these circumstances, the court in *O'Connor* concluded that the defend-ant homeowners' association fell within the category of "all business estab-lishments of every kind whatsoever" as that term is used in the Unruh Civil Rights Act.

---

[14]The court in *O'Connor* stated in this regard: "Contrary to the association's attempt to characterize itself as but an organization that 'mows lawns' for owners, the association in reality has a far broader and more businesslike purpose. The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629-unit project. It is also charged with establishing and collecting assessments from all owners to pay for its undertakings and with adopting and enforcing rules and regulations for the common good. In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders. A theme running throughout the description of the association's powers and duties is that its overall function is to protect and enhance the project's economic value." (33 Cal.3d at p. 796.)

Two years after the *O'Connor* decision, in *Isbister, supra,* 40 Cal.3d 72, our court returned to the question of the proper interpretation of the "business establishments" provision of the Unruh Civil Rights Act. The entity at issue in *Isbister* was the Boys' Club of Santa Cruz, Inc., a charitable, nonprofit organization that owned and operated a recreational facility in Santa Cruz. The facility contained a gym, swimming pool, craft rooms, and a snack bar; membership in the club was open to all boys in the community, and the facilities were used by members primarily on a drop-in basis.

In *Isbister,* the plaintiff maintained that the defendant's policy of excluding girls from membership in the club (and, as a consequence, from the use of its recreational facilities) violated the Unruh Civil Rights Act. As in *O'Connor, supra,* 33 Cal.3d 790, the defendant claimed that it was not subject to the Unruh Civil Rights Act because it was not a business establishment within the traditional meaning of that term, emphasizing that it was a nonprofit, charitable membership organization that did not have a commercial purpose.

The court in *Isbister, supra,* 40 Cal.3d 72, rejected the defendant's argument and found that the local Boys' Club at issue in that case constituted a business establishment within the meaning of the Act. In reaching this conclusion, the court explained that the origin and legislative history of the Unruh Civil Rights Act demonstrated that the Legislature, in enacting the Act in 1959, intended the new provision to cover at least all of the places of public accommodation or amusement that had been subject to the California public accommodation statute that preceded the Act. The court in *Isbister* then found that the attributes of the Boys' Club of Santa Cruz, Inc., demonstrated that it constituted a place of public amusement to which the statute was intended to apply. The court reasoned that in view of its prominent recreational facilities, the club was plainly a "place of amusement" comparable to those traditionally covered by public accommodation statutes, and further explained that the club was "classically 'public' in its operation [because it] . . . opens its recreational doors to the entire youthful population of Santa Cruz, with the sole condition that its users be male . . . ." (40 Cal.3d at p. 81, citation omitted.) In the course of reaching the conclusion that the Boys' Club of Santa Cruz should be considered a place of public accommodation and hence a "business establishment" for purposes of the Unruh Civil Rights Act, the court in *Isbister* pointed out, among other things, that a line of cases decided under title II of the federal Civil Rights Act of 1964 had reached a similar conclusion in finding a number of local recreational facilities owned and operated by local affiliates of the Young Men's Christian Association (YMCA) to be places of public accommodation and amusement and enjoining those entities from continuing their policy of

discriminating against African-Americans in their membership decisions. (See 40 Cal.3d at p. 80, citing *Smith* v. *Young Men's Christian Ass'n of Montgomery* (5th Cir. 1972) 462 F.2d 634, 648-649; *Nesmith* v. *Young Men's Christian Ass'n of Raleigh, N.C.* (4th Cir. 1968) 397 F.2d 96, 100-102.)

Although the court in *Isbister* concluded that the Boys' Club of Santa Cruz, Inc., came within the Unruh Civil Rights Act's category of "all business establishments of every kind whatsoever," the court at the same time was careful to point out that its holding in that case did *not* necessarily mean that the membership decisions of an organization—like the Boy Scouts—that is generally open to a large segment of the public, but whose primary function is not to operate a recreational facility for use on a drop-in basis, would fall within the reach of the Unruh Civil Rights Act. Thus, although the majority opinion in *Isbister* took note of the then recent Court of Appeal opinion in *Curran I* in which the appellate court had found that the Boy Scouts' "extension to the youthful public of a membership invitation limited only by sex made it a 'public' organization covered by the Unruh Act" (40 Cal.3d at p. 81, fn. 8), the court in *Isbister* did *not* embrace or endorse the ruling in *Curran I*, but instead explicitly "*reserve[d] judgment* as to whether any organization or entity serving a substantial segment of the public on a nonselective basis is a 'business establishment' within the Act's meaning." (*Ibid.*, italics added and omitted.) Furthermore, in response to the suggestion in a dissenting opinion that the court's decision in *Isbister* "*threatens many traditionally sex-segregated institutions, such as fraternities, sororities, private schools, and scouting organizations*" (*id.* at p. 84, fn. 14, italics added), the court in *Isbister* expressly declared that "*[n]othing we have said compels that result*" (*ibid.*, italics added) and explained that "we have stressed that the statute was intended to include those kinds of recreational *facilities* traditionally deemed 'accommodations' [and] . . . have not suggested that noncommercial groups which do not operate such facilities are covered 'business establishments.' " (*Ibid.*, original italics.) Finally, in the concluding passage of the decision, the court in *Isbister* once again made clear the limited scope of the decision, expressly stating that "[w]e caution again . . . that our holding is based on the particular nature and function of the [Boys' Club of Santa Cruz]. Nothing we say necessarily requires a similar result in the case of other single-sex youth organizations." (*Id.* at p. 91.)

Finally, as noted above, this court most recently addressed the question of the proper interpretation and application of the "business establishments" provision of the Unruh Civil Rights Act in *Warfield, supra,* 10 Cal. 4th 594, decided in 1995. In *Warfield,* the defendant was a private golf and country club that excluded women from the membership category ("Regular Family

Membership") that enjoyed the greatest privileges with regard to the use of the club's facilities. The plaintiff in *Warfield*, a woman who had been denied such a membership on the basis of the club's men-only policy, contended that the policy violated the Unruh Civil Rights Act by discriminating, on the basis of sex, in the advantages or privileges afforded by the club. The defendant club, in response, maintained that it was not a business establishment within the meaning of the Act because it was not operated for profit or to promote its members' business opportunities and because it was not generally open to the public and employed a very selective membership admission process.

In analyzing the parties' contentions in *Warfield*, the court first addressed the question whether "private social clubs, *as a general matter*, constitute 'business establishments' within the meaning of section 51." (10 Cal.4th at p. 614, original italics.) After acknowledging that the decisions in *O'Connor* and *Isbister* demonstrate that "the reach of section 51 cannot be determined invariably by reference to the apparent 'plain meaning' of the term 'business establishment' " (10 Cal.4th at p. 616), the court in *Warfield*—viewing the matter from a historical perspective—observed that "[t]raditionally, statutes prohibiting discrimination in places of public accommodation have *not* been applied to the membership policies of private social clubs" (*ibid.*), and found that nothing in the language or legislative history of either California's original 1897 public accommodation statute or the Unruh Civil Rights Act suggested that the Legislature intended to alter that situation. (*Id.* at p. 617.) The court in *Warfield* stated: "Although the 1959 enactment of the current version of section 51 clearly was intended to expand the reach of the 1897 statute, the Legislature's adoption of language making the statute applicable to 'all business establishments of every kind whatsoever' does not indicate that the contemplated expansion was intended, as a general matter, to encompass private social clubs." (*Ibid.*)

Although the court in *Warfield* thus concluded that the Unruh Civil Rights Act was not intended to encompass the membership decisions of private social clubs as a general matter, the court at the same time went on to explain that an entity or organization is not necessarily exempt from the Act simply because it has some of the attributes or characteristics of a private club. Referring initially to the United States Supreme Court's decision in *Daniel* v. *Paul* (1969) 395 U.S. 298 [89 S.Ct. 1697, 23 L.Ed.2d 318] as presenting "perhaps the clearest and most obvious illustration of this principle" (10 Cal.4th at p. 619), we noted that in rejecting the defendants' contention in that case that their recreational facility—Lake Nixon—was a private club exempt from the public accommodation provisions of the federal Civil Rights Act of 1964, the high court declared: " 'Lake Nixon is

not a private club. It is simply a business operated for a profit with none of the attributes of self-government and membership-ownership traditionally associated with private clubs. It is true that following enactment of the Civil Rights Act of 1964, the Pauls began referring to the establishment as a private club. They even began to require patrons to pay a 25-cent "membership" fee, which gains a purchaser a "membership" card entitling him to enter the Club's premises for an entire season . . . . But this "membership" device seems no more than a subterfuge designed to avoid coverage of the 1964 Act. White persons are routinely provided "membership" cards, and some 100,000 whites visit the establishment each season. . . . Negroes, on the other hand, are uniformly denied "membership" cards, and thus admission. . . . The conclusion of the courts below that Lake Nixon is not a private club is plainly correct . . . .' " (10 Cal.4th at p. 619, quoting *Daniel v. Paul, supra*, 395 U.S. at pp. 301-302 [89 S.Ct. at p. 1699].)

The defendant in *Daniel v. Paul* was an entity that was operated for profit, but we noted in *Warfield* that a number of other cases decided by the United States Supreme Court "demonstrate that the same principle applies to non-profit entities. In *Tillman* v. *Wheaton-Haven Recreation Assn.* (1973) 410 U.S. 431, 438 [35 L.Ed.2d 403, 409-410, 93 S.Ct. 1090], for example, the United States Supreme Court held that a nonprofit recreational association that was open to all Caucasian residents in a designated geographic area was not a 'private club' exempt from the federal public accommodation law, because the association had 'no plan or purpose of exclusiveness.' Similarly, in *Sullivan* v. *Little Hunting Park* (1969) 396 U.S. 229, 236 [24 L.Ed.2d 386, 392, 90 S.Ct. 400], the Supreme Court confirmed that the defendant community park could not properly be considered a 'private social club' exempt from the federal Civil Rights Act, because 'it is open to every white person within the geographic area, there being no selective element other than race.' " (*Warfield, supra*, 10 Cal.4th at pp. 619-620.)

In *Warfield*, the question was raised whether, under the standards that generally had been applied in federal cases and in other jurisdictions in determining the proper reach of those jurisdictions' public accommodation statutes, the attributes of the defendant country club at issue in *Warfield* rendered the defendant a "truly private club" or, instead, a public accommodation. Although the parties vigorously debated that matter, we ultimately found that there was no need to determine "whether defendant constitutes a 'private club' rather than a place of public accommodation under the multi-pronged standard developed in the out-of-state cases, because we conclude that *the business transactions that are conducted regularly on the club's premises with persons who are not members of the club* are sufficient in themselves to bring the club within the reach of section 51's broad reference

to 'all business establishments of every kind whatsoever.' " (10 Cal.4th at p. 621, original italics.)

In reaching this conclusion, the court in *Warfield* relied upon a number of aspects of the club's operations disclosed by the record in that case. The court noted first that "the club regularly (on the average of once a week) permits nonmembers to use its facilities, for a fee, in connection with 'sponsored events.' In conducting such events, the club receives funds from nonmembers for the use of the club's golf course, tennis courts, and dining and bar facilities, and also obtains revenue from the sale (at a markup) of food and beverages to nonmembers at the club's snack bar and other dining facilities on the club's premises." (10 Cal.4th at p. 621.) We explained in *Warfield* that "[i]n carrying on such activities for a fee, the club operates as the functional equivalent of a commercial caterer or commercial recreational resort—classic forms of 'business establishments'—and, indeed, presumably competes with business entities that offer comparable services and that clearly are subject to the strictures of section 51." (*Ibid.*)

Furthermore, the court in *Warfield* noted that "the club also obtains income, on a regular basis, from fees charged for the use of its facilities, and the purchase of food and beverages on its premises, by nonmember 'invited guests' " (10 Cal.4th at p. 621), and reasoned that "[t]o the extent the club obtains payment from nonmembers for meals served to guests in the club's dining room, for drinks obtained by guests from the club's bar, and for the guests' use of the club's golf course or other facilities, the club, once again, appears to have been operating in a capacity that is the functional equivalent of a commercial enterprise." (*Id.* at pp. 621-622.)

Finally, the court in *Warfield* pointed out that the record in that case demonstrated that "the club also obtains a significant, albeit indirect, financial benefit from the regular business transactions with nonmembers conducted at the golf and tennis pro shops located on its premises" (10 Cal.4th at p. 622), shops that the court concluded "realistically must be viewed as an integral part of the club's overall operations." (*Ibid.*)

Taking into consideration all of these activities, the court in *Warfield* found that "because of the involvement of defendant's operations in the variety of regular business transactions with nonmembers discussed above, the club must properly be considered a business establishment within the meaning of section 51. Although the club is a nonprofit organization, and there is no suggestion that the activities in question were intended to generate a profit that might be distributed to members, the direct and indirect financial benefits that the club derived from its business transactions with

nonmembers nonetheless inured to the financial benefit of the club members, because the revenue from such transactions permitted the members to maintain the club's facilities and services—which were reserved primarily for the benefit of the members—through the payment of dues and fees lower than would have been required in the absence of the income obtained from nonmembers. In light of the explicit language of section 51 (encompassing 'all business establishments of every kind whatsoever'), which, as this court observed in *Burks, supra,* 57 Cal.2d 463, 468, 'leaves no doubt that the term "business establishments" was used in the broadest sense reasonably possible,' we conclude that defendant club's regular business transactions with nonmembers render it a 'business establishment' for purposes of section 51." (10 Cal.4th at pp. 622-623, fn. omitted.)

## C

■ Plaintiff argues that under the holdings and reasoning of this court's past decisions in *Burks, O'Connor, Isbister,* and *Warfield,* defendant in this case properly must be considered a business establishment for purposes of the Unruh Civil Rights Act. Defendant disagrees, asserting that the Boy Scouts is clearly distinguishable from the entities involved in each of our past decisions, and that in light of the governing language and legislative history of the Act, the Court of Appeal was correct in concluding that the Act is not applicable here. As we shall explain, we conclude that, with regard to its membership decisions, defendant is not a business establishment within the meaning of the Unruh Civil Rights Act.[15]

We begin with the applicable statutory language. As we have seen, in expanding the reach of California's prior public accommodation law through the enactment of the Unruh Civil Rights Act in 1959, the Legislature chose to bring within the reach of the Act "all business establishments of every kind whatsoever." As plaintiff properly emphasizes, our past decisions have stressed that this language indicates that the term "business establishments" must properly be interpreted "in the broadest sense reasonably possible" (*Burks, supra,* 57 Cal.2d 463, 468), and, adhering to that principle, we have applied the Act to a variety of entities—like the nonprofit condominium owners association in *O'Connor, supra,* 33 Cal.3d 790—that ordinarily

---

[15]A question has been raised as to which level of the organizational hierarchy of the Boy Scouts—the troop, the regional council, or the national Boy Scouts of America—is the appropriate focus in determining whether defendant is a business establishment whose membership decisions are subject to the Unruh Civil Rights Act. There is no need to resolve that question in this case, because even if we assume that the level most favorable to plaintiff's position—the national Boy Scouts of America—is the appropriate point of reference, we conclude, for the reasons discussed below, that the organization's membership decisions do not fall within the reach of the Act.

might not be thought of as a traditional business establishment. Nonetheless, although past California decisions demonstrate that the Act clearly applies to any type of for-profit commercial enterprise, and to nonprofit entities—like the condominium association in *O'Connor*—whose purpose is to serve the business or economic interests of its owners or members,[16] no prior decision has interpreted the "business establishments" language of the Act so expansively as to include the membership decisions of a charitable, expressive, and social organization, like the Boy Scouts, whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members. (See, e.g., *Hart* v. *Cult Awareness Network* (1993) 13 Cal.App.4th 777 [16 Cal.Rptr.2d 705] [organization established to educate the public about the harmful effect of cults is not a business establishment for purposes of the Unruh Civil Rights Act].) In our view, given the organization's overall purpose and function, the Boy Scouts cannot reasonably be found to constitute a business establishment whose membership decisions are subject to the Act.

As plaintiff correctly points out, of course, this court's decision in *Isbister*, *supra*, 40 Cal.3d 72, concluded that in light of the legislative history demonstrating that the Unruh Civil Rights Act was intended *to extend* the reach of California's prior public accommodation statute, the very broad "business establishments" language of the Act reasonably must be interpreted to apply to the membership policies of an entity—even a charitable organization that lacks a significant business-related purpose—if the entity's attributes and activities demonstrate that it is the functional equivalent of a classic "place of public accommodation or amusement." (40 Cal.3d at p. 83.)

Contrary to plaintiff's further contention, however, we do not believe that the circumstance that the Boy Scouts is generally nonselective in its admission policies, and affords membership to a large segment of the public, is itself sufficient to demonstrate that the organization reasonably can be characterized as the functional equivalent of a traditional place of public accommodation or amusement. The record establishes that the Boy Scouts is an organization whose primary function is the inculcation of a specific set of values in its youth members, and whose recreational facilities and activities are complementary to the organization's primary purpose. Unlike membership in the Boys' Club of Santa Cruz, Inc., membership in the Boy Scouts is

---

[16]See, e.g., *Rotary Club of Duarte* v. *Board of Directors* (1986) 178 Cal.App.3d 1035 [224 Cal.Rptr. 213] (nonprofit civic association of business and professional men held to be a business establishment, where one of the primary purposes for which the organization was founded was to promote the business interests of its members and where the evidence disclosed that business concerns remain a principal motivation for joining the organization); *Pines* v. *Tomson* (1964) 160 Cal.App.3d 370 [206 Cal.Rptr. 866] (nonprofit religious corporation that publishes a business telephone directory held to be a business establishment).

not simply a ticket of admission to a recreational facility that is open to a large segment of the public and has all the attributes of a place of public amusement. Scouts meet regularly in small groups (often in private homes) that are intended to foster close friendship, trust and loyalty, and scouts are required to participate in a variety of activities, ceremonies, and rituals that are designed to teach the moral principles to which the organization subscribes.

As we have seen, in *Isbister* the court made clear that the holding in that case was based upon the circumstance that the Boys' Club of Santa Cruz possessed the attributes of a traditional place of public amusement and that membership in the club was equivalent to admission to a place of public amusement, and expressly disavowed the suggestion that the ruling in that case compelled the conclusion that the Unruh Civil Rights Act applied to the membership decisions of scouting organizations or other groups that, while open to a broad segment of the public, are not the functional equivalents of places of public accommodation or amusement. (See *Isbister, supra,* 40 Cal.3d at p. 84, fn. 14.) Plaintiff has cited no authority, and we are aware of none, that suggests an organization like the Boy Scouts would have been considered a place of public accommodation or amusement under California's earlier public accommodation law,[17] and the majority of courts in other jurisdictions that have addressed the question whether membership in the Boy Scouts is covered by the particular jurisdiction's public accommodation statute have concluded that the Boy Scouts does not fall within the reach of their law.[18] Accordingly, we conclude that neither the holding nor the reasoning of the decision in *Isbister* supports plaintiff's argument that defendant properly must be considered a business establishment whose membership decisions are subject to the Unruh Civil Rights Act.

Plaintiff contends, however, that even if the cases preceding this court's recent decision in *Warfield, supra,* 10 Cal.4th 594, do not demonstrate that

[17]Although we have found no case in which a plaintiff claimed that an organization with the attributes of the Boy Scouts fell within the reach of California's earlier public accommodation statute, in light of the rather restrictive interpretation of the prior statute in the series of Court of Appeal decisions that led to the enactment of the Unruh Civil Rights Act in 1959 (see *Warfield, supra,* 10 Cal.4th 594, 608 [citing cases]) we believe it is reasonable to conclude that the earlier statute would not have been interpreted to apply to the Boy Scouts.

[18]See *Welsh* v. *Boy Scouts of America* (7th Cir. 1993) 993 F.2d 1267 (Boy Scouts is not a "place of public accommodation or amusement" under title II of the federal Civil Rights Act of 1964); *Seabourn* v. *Coronado Area Council* (1995) 257 Kan. 178 [891 P.2d 385] (Boy Scouts not subject to state public accommodation law); *Schwenk* v. *Boy Scouts of America* (1976) 275 Or. 327 [551 P.2d 465] (same); but compare *Quinnipiac Coun.* v. *Com'n on Human Rights* (1987) 204 Conn. 287· [528 A.2d 352] (Boy Scouts falls within scope of state public accommodation law, but denial of opportunity to serve as scoutmaster did not deprive plaintiff of an "accommodation" as that term is used in the applicable statute); *Dale* v. *Boy Scouts of America* (1998) 308 N.J. Super. 516 [706 A.2d 270] (Boy Scouts is a place of public accommodation under state public accommodation statute).

the membership decisions of the Boy Scouts fall within the reach of the Unruh Civil Rights Act, the extensive business activities that the Boy Scouts regularly conducts with nonmembers—in its retail shops or stores, and through the licensing of the use of its insignia—properly should render the organization a business establishment under the reasoning in *Warfield*. In our view, however, the circumstances in *Warfield* are clearly distinguishable from those presented in this case.

As discussed above, the defendant in *Warfield, supra,* 10 Cal.4th 594, was a private golf and country club whose primary functions providing recreational facilities (a golf course, a driving range, putting greens, tennis courts, and a swimming pool) and food and drink to its members in return for the payment of dues and fees were comparable to the functions performed by commercial entities that unquestionably constitute places of public accommodation or amusement. Although the country club in *Warfield* argued that it was not subject to the Unruh Civil Rights Act because its facilities generally were not open to the public and because its membership process was quite selective, we concluded that the defendant should be considered a business establishment within the meaning of the Unruh Civil Rights Act in light of "the business transactions that are conducted regularly on the club's premises with persons who are not members of the club." (10 Cal.4th at p. 621, italics omitted.) As we have seen, the business transactions with nonmembers at issue in *Warfield* involved the country club's practice of permitting, on a regular basis, nonmembers to use the various recreational and dining facilities of the club for a fee, a practice that generated a substantial amount of revenue for the club and provided a financial benefit to club members by permitting them to enjoy their preferred access to the club's facilities through the payment of lower dues and fees. As noted above, we explained in *Warfield* that "[i]n carrying on such activities for a fee, the club operates as the functional equivalent of a commercial caterer or a commercial recreational resort—classic forms of 'business establishments' —and, indeed, presumably competes with business entities that offer comparable services and that clearly are subject to the strictures of section 51." (10 Cal.4th at p. 621.)

Although the record in this case indicates that the Boy Scouts, like the country club in *Warfield*, engages in business transactions with nonmembers on a regular basis (through the operation of retail shops and the licensing of the use of its insignia), the Boy Scouts' business activities differ from those of the defendant in *Warfield* in a very significant respect. As we have seen, the Boy Scouts is an expressive social organization whose primary function is the inculcation of values in its youth members, and whose small social group structure and activities are not comparable to those of a traditional place of public accommodation or amusement. Unlike those involved in

*Warfield*, the business transactions with nonmembers engaged in by the Boy Scouts do *not* involve the sale of access to the basic activities or services offered by the organization. Nonmembers cannot purchase entry to pack or troop meetings, overnight hikes, the national jamboree, or any portion of the Boy Scouts' extended training and educational process. Although we have no doubt that the Unruh Civil Rights Act would apply to, and would prohibit discrimination in, the actual business transactions with nonmembers engaged in by the Boy Scouts in its retail stores and elsewhere[19]—indeed, at oral argument, defendant's counsel conceded this point—we conclude that such transactions do not render the Boy Scouts a business establishment so as to bring its membership policies or decisions within the reach of the Unruh Civil Rights Act. Those business transactions are distinct from the Scouts' core functions and do not demonstrate that the organization has become a commercial purveyor of the primary incidents and benefits of membership in the organization.

Accordingly, taking into consideration the language, legislative history, and purpose of the Unruh Civil Rights Act, and this court's prior decisions interpreting the Act, we conclude that defendant is not a business establishment whose membership policies or decisions fall within the reach of the Act.[20]

D

As noted above, in reaching a contrary conclusion, the trial court expressed concern that if it did not interpret the "business establishments" provision of the Unruh Civil Rights Act to apply to the membership decisions of the Boy Scouts, the Boy Scouts would be free to discriminate in its membership decisions on any basis, and that no remedy would be available even if, for example, the Boy Scouts were to exclude a boy from scouting on the basis of his race. For a number of reasons, we do not believe that the

---

[19]A number of cases decided under the public accommodation statutes of other states support this conclusion. (See, e.g., *Batavia Lodge, etc.* v. *N.Y. St. Div. of Hum. Rts.* (1974) 35 N.Y.2d 143 [359 N.Y.S.2d 25, 316 N.E.2d 318, 359] [private lodge, not otherwise subject to the public accommodation statute, violated public accommodation statute by discriminatorily refusing bar service to African-American guests who were attending a fashion show at the lodge]; *Commonwealth, Hum. R. Com'n* v. *Local Ord. of Moose* (1972) 448 Pa. 451 [294 A.2d 594] [public accommodation law's prohibition on racial discrimination applies to private club's policy with regard to the service of guests in its dining room].)

[20]Although defendant has not suggested in the briefs filed in this court that the decisions in either *Isbister* or *Warfield* should be reconsidered, Justice Mosk's and Justice Brown's concurring opinions argue that both of these decisions were wrongly decided and should be overruled. As we have explained in text, the present case is clearly distinguishable from the circumstances presented in either *Isbister* or *Warfield*, and thus there is no need to revisit those cases in order to conclude that the membership decisions of the Boy Scouts are not subject to the Unruh Civil Rights Act.

interpretation of the Act adopted by the trial court can be sustained on this ground.

To begin with, even though the provisions of the Unruh Civil Rights Act do not apply to the membership policies of the Boy Scouts, it does not follow, as the trial court assumed, that the Boy Scouts are therefore free to exclude boys from membership on the basis of race, or on other constitutionally suspect grounds, with impunity. The Unruh Civil Rights Act is not the only legislative measure that is aimed at curbing discrimination on the basis of race, and in other contexts courts have upheld the imposition of a variety of sanctions—including the denial of tax-exempt status—upon an otherwise qualified nonprofit entity that engages in racial discrimination. (See, e.g., *Bob Jones University* v. *United States* (1983) 461 U.S. 574 [103 S.Ct. 2017, 76 L.Ed.2d 157] [upholding denial of federal tax-exempt status to private school that engaged in racial discrimination].)

Moreover, even if other potential remedies against invidious discrimination by an organization like the Boy Scouts are considered inadequate, that circumstance cannot justify extending the scope of the Unruh Civil Rights Act further than its language reasonably will bear. Whether or not the members of this court share the view of the trial court that, as a matter of sound public policy, the membership policies of "an organization of the size, non-selectivity, and visibility" of the Boy Scouts properly should be subject to the nondiscrimination restrictions embodied in the Unruh Civil Rights Act, that question presents a policy issue that lies within the province of the legislative, rather than the judicial, branch. Subject, of course, to constitutional constraints, the Legislature remains free to extend the provisions of the Unruh Civil Rights Act to additional entities or organizations, or to enact new legislative measures to address any gaps or inadequacies that it finds in the current statutory provisions. For the reasons discussed above, however, we conclude that the existing language of the Unruh Civil Rights Act— applicable to "all business establishments of every kind whatsoever"— cannot reasonably be interpreted to bring the membership decisions of the Boy Scouts within the reach of the Act.

### III

In light of our conclusion that the judgment in favor of defendant should be sustained on the basis of the initial statutory interpretation issue, we have no occasion to pass upon the merits of the constitutional claims also made by defendant.

The judgment of the Court of Appeal, upholding the judgment rendered by the trial court in favor of defendant, is affirmed.

Kennard, J., Baxter, J., and Chin, J., concurred.

**MOSK, J.**—I concur in the result.

Through its Mount Diablo Council, the Boy Scouts of America denied Timothy Curran membership as a "Scouter," that is, an adult troop leader with the position of scoutmaster or assistant scoutmaster, because of his sexual orientation—specifically, because of his homosexual status and/or conduct and/or advocacy.

Thereupon, Curran brought an action in the superior court against the Boy Scouts, specifically, the Mount Diablo Council, claiming in substance that, by denying him membership, it violated section 51 of the Civil Code (hereafter section 51), the so-called Unruh Civil Rights Act, which prohibits discrimination on bases including sexual orientation. Determining that section 51 covered the Boy Scouts in the formulating and implementing of membership policies as to members and potential members, but that its application would infringe its members' right of expressive association under the First Amendment to the United States Constitution, the superior court rendered judgment in favor of the Mount Diablo Council and against Curran.

The Court of Appeal affirmed. It agreed with the superior court as to the infringement of the First Amendment right of expressive association. But it disagreed as to the coverage of section 51. It gave judgment accordingly.

I agree with my colleagues that we must affirm. For, as I shall explain, I am of the view that section 51 does not cover the Boy Scouts in the formulating or implementing of membership policies as to members or potential members.

My conclusion, I hasten to add, is compelled by section 51. Here, that is the beginning and the end of the matter. But let us not ignore what lies behind. That the law does not prohibit the Mount Diablo Council from shutting Curran out cannot obscure the fact that he is the very kind of person whom it should receive most eagerly—a person whom it has itself honored as an Eagle Scout. Regrettably, the situation will remain such until the law changes. (But see conc. opn. of Kennard, J., *post*, at pp. 722-729.) Or, perhaps, until the ideals of scouting transform its conduct.

I

In part pertinent here, section 51 expresses a policy against discrimination, on certain bases, in the general area of relationships between private persons and entities: "All persons within the jurisdiction of this state are free and

equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." In addition to those listed, the prohibited bases of discrimination have been construed to include sexual orientation. (See, e.g., *Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1154-1162 [278 Cal.Rptr. 614, 805 P.2d 873]; *In re Cox* (1970) 3 Cal.3d 205, 213-216 [90 Cal.Rptr. 24, 474 P.2d 992]; *Hubert* v. *Williams* (1982) 133 Cal.App.3d Supp. 1, 5 [184 Cal.Rptr. 161].)

By its terms, section 51 covers "all business establishments of every kind whatsoever."

But what does the phrase "business establishments" mean?

"It is common ground that, in 'undertak[ing] to construe a statute,' 'courts . . . "ask only what the statute means." (Holmes, Collected Legal Papers (1920) p. 207.) And when they consider that question, they ask only what its words mean. For a statute, as it were, is a complete integration. Within its scope, it is the final and exclusive statement by the legislative body of its intent, superseding all prior and contemporaneous expressions and implications, not only those that are directly contrary but even those that are altogether consistent. Perhaps more accurately, it is the legislative body's final and exclusive enactment, displacing all terms and conditions of whatever sort that could, would, or might have been passed. To seek the meaning of a statute is not simply to look up dictionary definitions and then stitch together the results. Rather, it is to discern the sense of the statute, and therefore its words, in the legal and broader culture. Obviously, a statute has no meaning apart from its words. Similarly, its words have no meaning apart from the world in which' "—and the purpose for which—" 'they are spoken.' " (*People* v. *Hazelton* (1996) 14 Cal.4th 101, 117 [58 Cal.Rptr.2d 443, 926 P.2d 423] (conc. opn. of Mosk, J.), quoting *Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 672-673 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (conc. opn. of Mosk, J.), italics omitted.)

The phrase "business establishments" is not defined in section 51, either in express terms or by implication. Moreover, it has not been given a consistent or satisfying reading in our decisions. It accordingly demands a full and fresh reconsideration.

In 1905—as explained by Professor Harold W. Horowitz, its leading commentator (Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33

So.Cal.L.Rev. 260 (hereafter Horowitz))—section 51 was added to the Civil Code. (Stats. 1905, ch. 413, § 1, p. 553.) It did not mention "business establishments." Rather, it spoke of "places of public accommodation or amusement"—which, for convenience' sake, we shall refer to simply as "places of public accommodation"—listing certain particular classes thereof. It provided: "All citizens within the jurisdiction of this state shall be entitled to the full and equal accommodations, advantages, facilities, and privileges of inns, restaurants, hotels, eating houses, barber shops, bath houses, theaters, skating rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens." (Stats. 1905, ch. 413, § 1, p. 553.) In 1919, it was amended through, among other things, the addition of "public conveyances" to the list. (Stats. 1919, ch. 210, § 1, p. 309.) In 1923, it was further amended through the addition to the list of "places where ice cream or soft drinks of any kind are sold for consumption on the premises." (Stats. 1923, ch. 235, § 1, p. 485.)

In its original form, section 51 was, by its terms, what Professor Horowitz has called a " 'public accommodations' statute." (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 263, fn. omitted.)

The proximate source of section 51 in its original form was an uncodified statute (Stats. 1897, ch. 108, § 1, p. 137) enacted in 1897. (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 263.) It was virtually identical to that statute, which provided in pertinent part: "[A]ll citizens within the jurisdiction of this State shall be entitled to the full and equal accommodations, advantages, facilities, and privileges of inns, restaurants, hotels, eating-houses, barber-shops, bath-houses, theaters, skating-rinks, and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law and applicable alike to all citizens." (Stats. 1897, ch. 108, § 1, p. 137.)

The ultimate source of section 51 in its original form was the federal Civil Rights Act of 1875 (18 Stat. 335), which had been held unconstitutional in pertinent part by the United States Supreme Court in the *Civil Rights Cases* (1883) 109 U.S. 3 [3 S.Ct. 18, 27 L.Ed. 835]. (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 263.) It was substantially similar to the federal statute, which provided in its first section: "[A]ll persons within the jurisdiction of the United States ·shall be entitled to the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theaters, and other places of public amusement; subject only to the conditions and limitations established by law, and applicable to citizens of every race and color, regardless of any previous condition of servitude." (18 Stat. 336.)

In its original form, section 51 generally prohibited discrimination. That is plain from its words, which generally protected "[a]ll citizens." (Stats. 1905, ch. 413, § 1, p. 553.) Section 51 specifically prohibited racial discrimination. That is plain from its ultimate source in the Civil Rights Act of 1875, which was "applicable to citizens of every race and color, regardless of any previous condition of servitude." (18 Stat. 336.) Section 51 prohibited discrimination, however, only in "places of public accommodation"—which are areas that are explicitly in "public view" at physical locations (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 279), and that are implicitly given over to activity encompassing the relationship between a proprietor and a patron, which involves the providing of goods or services, "nongratuitous[ly]," for a price or fee, in the course of "relatively noncontinuous, nonpersonal, and nonsocial" dealings (*id.* at p. 280).

Hence, the purpose of section 51 in its original form was "to prevent racial" and other "discrimination . . . in those relationships between people which take place more or less in 'public view . . .'" at physical locations, and "which are of a . . . nongratuitous" and "relatively . . . noncontinuous, nonpersonal, and nonsocial sort" (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 282)—"primarily because of the psychological injury to those discriminated against" (*ibid.*), "in the form of invasion of interests in dignity and self-respect, including interests in not being subjected to humiliation" (*id.* at p. 278), and, "more generally, . . . because of the adverse overall effect of [such] discrimination on the community as a whole" (*id.* at p. 282).[1]

As a consequence, section 51 in its original form effectively struck a balance between the potential "discriminatee's interest in not being subjected to racial" or other "discrimination" and the potential discriminator's "interest . . . in having freedom of choice in the utilization of his property or facilities and in the selection of those persons with whom he wishes to deal." (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 280.)

In 1959, section 51 was amended into its present form to speak of "business establishments" and not "places of public accommodation": "All

---

[1]The purpose of section 51 in its original form cannot be deemed to have been merely to codify the "common-law doctrine," annunciated in decisions such as *Willis* v. *McMahan* (1891) 89 Cal. 156 [26 P. 649], and *Turner* v. *N.B. & M.R.R. Co.* (1868) 34 Cal. 594, that "innkeepers and common carriers had a duty to extend their facilities to all members of the public in the absence of some reasonable justification for not doing so." (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 276, fns. omitted.) Such doctrine found its reason, as to innkeepers, in the "need for protection of travelers against brigands and for shelter," and, as to common carriers, in the "need of the public for the facilities of a carrier, analogizing the carrier to an innkeeper, and, in some situations, [in] the monopoly status of a common carrier . . . ." (*Ibid.*) The provision reached beyond innkeepers and common carriers to "places of public accommodation," such as skating rinks, that were not within the scope of the doctrine and did not implicate its reasons. (*Id.* at p. 277.) Moreover, it did not list common carriers until 1919, and then only under the rubric of "public conveyances."

citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. . . ." (Stats. 1959, ch. 1866, § 1, p. 4424.) In 1961, it was further amended, in pertinent part, with the substitution of "persons" for "citizens." (Stats. 1961, ch. 1187, § 1, p. 2920.) In 1974, it was amended still further in the same part through the addition of "sex" to the list of prohibited bases of discrimination. (Stats. 1974, ch. 1193, § 1, p. 2568.) In 1987, it was amended yet further in the same part through the addition to the list of "blindness or other physical disability." (Stats. 1987, ch. 159, § 1, p. 1094.) In 1992, it was amended for a final time in the same part with the substitution of "disability" for "blindness or other physical disability." (Stats. 1992, ch. 913, § 3, p. 4283.) As it now stands, it provides in pertinent part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, or disability are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

In its present form, section 51 is, by its terms, what Professor Horowitz has called a "business establishments" statute. (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 262.) At its enactment almost 40 years ago, it was "unique" in "expressing its policy against racial and other discrimination in this general area of relationships between private persons [and entities] . . . without the use of the word 'public,' and with the use of the words 'business' and 'establishments.' " (*Ibid.*) It remains the same in this regard today.

The meaning of the phrase "business establishments" in section 51 is not declared by its words. We must therefore seek to discern its sense beyond.

In order to determine what the phrase "business establishments" means in section 51, let us first consider the background of the provision. When we do so, we meet the courts' construction and application of section 51 in its original form, which spoke of "places of public accommodation." To use Professor Horowitz's words, such construction and application were often "fortuitous" and "inconsistent." (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 276.) The reason may be found in the fact that courts often attempted to determine whether the "place" in question was one of "public accommodation" by a kind of superficial *ejusdem generis* analysis that turned, as it were, on appearance and not reality—that is to say, on whether the "place" *looked* like one or more of those listed in the provision, and not on whether it *was* like them in view of the provision's purpose. (*Id.* at pp. 272-276.)

Thus, in *James* v. *Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], we apparently accepted an argument that a craft union did not operate as a "place of public accommodation" under section 51 in its original form in the formulating or implementing of membership policies as to members or potential members. We gave no reason. (*James* v. *Marinship Corp.*, *supra*, 25 Cal.2d at p. 740.) Our result, however, seems to have been sound. Strictly speaking, the craft union was not in public view at a physical location. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 284, fn. 86.) Moreover, the relationship between the craft union and the member or potential member in the formulating and implementing of membership policies was not that of proprietor and patron: notwithstanding the payment of dues, it did not, in actuality, involve the providing of goods or services, nongratuitously, for a price or fee; moreover, the dealings in question were not relatively noncontinuous, nonpersonal, and nonsocial. (See *id.* at p. 284.)

In *Evans* v. *Fong Poy* (1941) 42 Cal.App.2d 320 [108 P.2d 942], the Court of Appeal concluded that a bar operated as a "place of public accommodation" under section 51 in its original form in the serving of beverages to drinkers. (*Evans* v. *Fong Poy*, *supra*, 42 Cal.App.2d at p. 321.) It gave no reason, stating only that the quoted phrase "obviously covers" such premises. (*Ibid.*) Its result, however, was sound. The bar was in public view at a physical location. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 282.) Furthermore, the relationship between the barkeeper and the drinker in the serving of beverages was that of proprietor and patron, since it involved the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings. (See *ibid.*)

In *Suttles* v. *Hollywood Turf Club* (1941) 45 Cal.App.2d 283, 286 [114 P.2d 27], the Court of Appeal similarly concluded that a racetrack operated as a "place of public accommodation" under section 51 in its original form in the taking of bets from wagerers. (*Suttles* v. *Hollywood Turf Club*, *supra*, 45 Cal.App.2d at p. 286.) It gave no reason, merely quoting a statement in a legal encyclopedia that a " 'general clause in a civil rights statute, such as "any other place of public accommodation . . . ," includes . . . a racetrack . . . .' " (*Ibid.*, italics omitted.) Its result, however, was sound. The racetrack was in public view at a physical location. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 282.) Moreover, the relationship between the racetrack and the wagerer in the taking of bets was that of proprietor and patron, since it involved the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings. (See *ibid.*)

In *Long* v. *Mountain View Cemetery Assn.* (1955) 130 Cal.App.2d 328 [278 P.2d 945], the Court of Appeal concluded that a cemetery did not

operate as a "place of public accommodation" under section 51 in its original form in the furnishing of burial ground to survivors of decedents. (*Long* v. *Mountain View Cemetery Assn.*, *supra*, 130 Cal.App.2d at p. 329.) It gave no reason, simply relying on the authority of other courts in other jurisdictions under other statutes. (*Ibid.*) Its result was unsound. The cemetery was in public view at a physical location. (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 283.) Furthermore, the relationship between the cemetery and the survivor in the furnishing of burial ground was that of proprietor and patron, since it involved the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings. (*Ibid.*)

In *Coleman* v. *Middlestaff* (1957) 147 Cal.App.2d Supp. 833 [305 P.2d 1020], the appellate department of the superior court similarly concluded that a dentist's office did not operate as a "place of public accommodation" under section 51 in its original form in the rendering of professional services to patients. (*Coleman* v. *Middlestaff*, *supra*, 147 Cal.App.2d at pp. Supp. 834-835.) It gave little reason, relying essentially on the authority of *Long* v. *Mountain View Cemetery Assn.*, *supra*, 130 Cal.App.2d 328, and on the authority of another court in another jurisdiction under another statute. (*Coleman* v. *Middlestaff*, *supra*, 147 Cal.App.2d at pp. Supp. 834-835.) Whether or not its result was sound is unclear. The dentist's office was at a physical location, but it was not in public view, at least not fully. (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 285.) Moreover, the relationship between the dentist and the patient in the rendering of professional services was somewhat like, and somewhat unlike, that of proprietor and patron: it involved the providing of goods or services, nongratuitously, for a price or fee; but, although the dealings in question were relatively nonsocial, they were not relatively noncontinuous and nonpersonal. (*Ibid.*)

In *Lambert* v. *Mandel's of California* (1957) 156 Cal.App.2d Supp. 855 [319 P.2d 469], the appellate department of the superior court concluded that a shoe store operated as a "place of public accommodation" under section 51 in its original form in the selling of footwear to customers. (*Lambert* v. *Mandel's of California*, *supra*, 156 Cal.App.2d at pp. Supp. 856-857.) It gave a reason, to the effect that a shoe store is "open to the public generally for the purchase of goods." (*Id.* at p. Supp. 857.) Its reason was valid. Hence, its result was sound. The shoe store was in public view at a physical location. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 282.) Furthermore, the relationship between the shoe salesperson and the customer in the selling of footware was that of proprietor and patron, since it involved the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings. (See *ibid.*)

Finally, in *Reed* v. *Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887 [338 P.2d 633], the appellate department of the superior court concluded that a private school did not operate as a "place of public accommodation" under section 51 in its original form in the formulating or implementing of admissions policies as to students or potential students. (*Reed* v. *Hollywood Professional School*, *supra*, 169 Cal.App.2d at p. Supp. 890.) It gave a reason, to the effect that a private school is not a *public* accommodation because it is *privately owned*. (*Id.* at pp. Supp. 890-892.) Its reason was invalid. Most public accommodations were privately owned (see Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 274)—such as the "inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, [and] public conveyances" listed in the provision (Stats. 1923, ch. 235, § 1, p. 485). They were not rendered nonpublic as a consequence. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 274.)[2] Nevertheless, whether or not the result was sound is unclear. The private school was at a physical location, but it was not in public view, at least not fully. (Horowitz, *supra*, 33 So.Cal.L.Rev. at pp. 285-286.) Moreover, the relationship between the headmaster and the student or potential student in the formulating and implementing of admissions policies was somewhat like, and somewhat unlike, that of proprietor and patron: it involved the providing of goods or services, nongratuitously, for a price or fee; but the dealings in question were not relatively noncontinuous, nonpersonal, and nonsocial. (*Ibid.*)

In order to determine what the phrase "business establishments" means in section 51, let us now turn from the background of the provision to its genesis. As Professor Horowitz has stated, "[t]here are no published committee hearings, committee reports, or floor debates" concerning its source, which was Assembly Bill No. 594, 1959 Regular Session (hereafter Assembly Bill No. 594); "the only available legislative materials are the several drafts of the statute, with no contemporaneous explanations of the terms used in the bill or of the changes made in the bill as it progressed toward passage." (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 265.) Because these "drafts" are all that we have, they will be set out at length.

As introduced on January 21, 1959, Assembly Bill No. 594 would have amended section 51 in its original form, through the addition of the language printed in italics and the deletion of the language printed in "strike-out," to read in pertinent part as follows:

---

[2]See Klein, *The California Equal Rights Statutes in Practice* (1958) 10 Stan.L.Rev. 253, 255 (stating that section 51 in its original form was "concerned . . . with the protection of equal rights with respect to facilities and services offered to the public by *private* persons" [italics added]).

"... All citizens within the jurisdiction of this State, *no matter what their race, color, religion, ancestry, or national origin,* are entitled to the full and equal *admittance,* accommodations, advantages, facilities, *membership,* and privileges *in, or accorded by, all public or private groups, organizations, associations, business establishments, schools, and public facilities; to purchase real property; and to obtain the services of any professional person, group or association.*

"... ~~of inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens.~~" (As printed in Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 265, fn. 31.)

On March 24, 1959, Assembly Bill No. 594 was amended in this part through the addition of the language printed in italics:

"All citizens within the jurisdiction of this State, no matter what their race, color, religion, ancestry, or national origin, are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, and privileges in, or accorded by, all public or private groups, organizations, associations, business establishments, schools, and public facilities, *except those institutions organized primarily for the purpose of, and which practice, the furthering of a specific sectarian religious belief or a specific national culture, and which limit their membership or affiliations to only those persons with a corresponding religious belief or national derivation;* to purchase real property; and to obtain the services of any professional person, group or association." (As printed in Horowitz, *supra,* 33 So.Cal.L.Rev. at p. 266, fn. 32.)

On March 30, 1959, Assembly Bill No. 594 was further amended through the addition of the language printed in italics and the deletion of the language printed in strike-out:

"~~All citizens within the jurisdiction of this State, no matter what their race, color, religion, ancestry, or national origin~~[,] ~~are entitled to the full and equal admittance, accomodations~~ [*sic*]~~, advantages, facilities, membership, and privileges in, or accorded by, all public or private groups, organizations, associations, business establishments, schools, and public facilities, except those institutions organized primarily for the purpose of, and which practice, the furthering of a specific sectarian religious belief or a specific national culture, and which limit their membership or affiliations to only those persons with a corresponding religious belief or national derivation; to~~

~~purchase real property; and to obtain the services of any professional person, group or association.~~

". . . *All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out, but not limited, by this section:*

"*(a) To all business establishments of every kind whatsoever;*

"*(b) To all schools of every kind whatsoever, except those schools organized for the purpose of, and which practice, the furthering of a specific sectarian religious belief;*

"*(c) To the benefits administered or offered by any organization or institution receiving any tax advantage or exemption, or receiving any form of assistance from the Federal Government, or the State of California, or any municipality or any political subdivision of either;*

"*(d) To membership in any and all business or professional organizations formed or maintained primarily for the protection or advancement of the business or professional interests of the members;*

"*(e) To obtain the services of any professional person, group or association licensed or certified by the State of California, any municipality or political subdivision or agency of either.*" (As printed in Horowitz, *supra*, 33 So.Cal.L.Rev. at pp. 266-267, fn. 33, except as to added brackets and bracketed material.)

On April 24, 1959, Assembly Bill No. 594 was again amended through the addition of the language printed in italics:

". . . All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out, but not limited, by this section:

"(a) To all business establishments of every kind whatsoever;

"(b) To all schools of every kind whatsoever, except those schools organized for the purpose of, and which practice, the furthering of a specific

sectarian religious belief[,] *insofar as the facilities of any such school so organized and following such practice are made available primarily to persons who subscribe to such belief*[;]

"(c) To the *charitable* benefits administered or offered by any organization or institution receiving any tax advantage or exemption, or receiving any form of assistance from the Federal Government, or the State of California, or any municipality or any political subdivision of either;

"(d) To membership in any and all business or professional organizations formed or maintained primarily for the protection or advancement of the business or professional interests of the members;

"(e) To obtain the services of any professional person, group or association licensed or certified by the State of California, any municipality or political subdivision or agency of either." (As printed in Horowitz, *supra*, 33 So.Cal.L.Rev. at pp. 267-268, fn. 34, except as to added brackets and bracketed material.)

On May 12, 1959, Assembly Bill No. 594 was amended yet again as to the language quoted in the preceding paragraph through the addition of the language printed in italics and the deletion of the language printed in strike-out:

". . . All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out, but not limited by this section:

"(a) To all business establishments of every kind whatsoever;

"(b) To all schools of every kind whatsoever, except those

"*(b) To all schools which primarily offer business or vocational training;* schools organized for the purpose of, and which practice, the furthering of a specific sectarian religious belief, insofar as the facilities of any such school so organized and following such practice are made available primarily to persons who subscribe to such belief;

"(c) To the charitable benefits administered or offered .by any organization or institution receiving any *direct subvention* tax advantage or exemption, or receiving any form of assistance from the Federal Government, or

the State of California, or any municipality or any political subdivision of either;

"(d) ~~To membership in~~ *In* any and all business or professional organizations formed or maintained *by licensees of the State of California* primarily for the protection or advancement of the business or professional interests of the members;

"(e) ~~To obtain the services of~~ *From* any professional person, group or association licensed or certified by the State of California, any municipality or political subdivision or agency of either." (As printed in Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 268, fn. 35.)

On June 11, 1959, Assembly Bill No. 594 was further amended as to the language quoted in the preceding paragraph through the deletion of language printed in strike-out:

". . . All citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal admittance, accommodations, advantages, facilities, membership, privileges, services or benefits set out by this section:

"(a) To all business establishments of every kind whatsoever;

"(b) To all schools which primarily offer business or vocational training[.]

"~~(c) To the charitable benefits administered or offered by any organization or institution receiving any direct subvention from the Federal Government, or the State of California, or any municipality or any political subdivision of either;~~

"~~(d) In any and all business or professional organizations formed or maintained by licensees of the State of California primarily for the protection or advancement of the business or professional interests of the members;~~

"~~(e) From any professional person, group or association licensed or certified by the State of California, any municipality or political subdivision or agency of either.~~" (As printed in Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 269, fn. 36, except as to added brackets and bracketed material.)

On June 15, 1959, Assembly Bill No. 594 was amended as to the language quoted in the preceding paragraph through the addition of the language

printed in italics and the deletion of the language printed in strike-out, and, as amended, was subsequently passed:

"A̶l̶l̶ *This section shall be known, and may be cited, as the Unruh Civil Rights Act.*

". . . *All* citizens within the jurisdiction of this State are free and equal, and no matter what their race, color, religion, ancestry, or national origin are entitled to the full and equal a̶d̶m̶i̶t̶t̶a̶n̶c̶e̶,̶ ̶a̶c̶c̶o̶m̶m̶o̶d̶a̶t̶i̶o̶n̶s̶,̶ ̶a̶d̶v̶a̶n̶t̶a̶g̶e̶s̶,̶ f̶a̶c̶i̶l̶i̶t̶i̶e̶s̶,̶ ̶m̶e̶m̶b̶e̶r̶s̶h̶i̶p̶,̶ ̶p̶r̶i̶v̶i̶l̶e̶g̶e̶s̶,̶ ̶s̶e̶r̶v̶i̶c̶e̶s̶ ̶o̶r̶ ̶b̶e̶n̶e̶f̶i̶t̶s̶ ̶s̶e̶t̶ ̶o̶u̶t̶ ̶b̶y̶ ̶t̶h̶i̶s̶ ̶s̶e̶c̶t̶i̶o̶n̶:̶

"(̶a̶)̶ ̶T̶o̶ ̶a̶l̶l̶ ̶b̶u̶s̶i̶n̶e̶s̶s̶ ̶e̶s̶t̶a̶b̶l̶i̶s̶h̶m̶e̶n̶t̶s̶ ̶o̶f̶ ̶e̶v̶e̶r̶y̶ ̶k̶i̶n̶d̶ ̶w̶h̶a̶t̶s̶o̶e̶v̶e̶r̶;̶

"(̶b̶)̶ ̶T̶o̶ ̶a̶l̶l̶ ̶s̶c̶h̶o̶o̶l̶s̶ ̶w̶h̶i̶c̶h̶ ̶p̶r̶i̶m̶a̶r̶i̶l̶y̶ ̶o̶f̶f̶e̶r̶ ̶b̶u̶s̶i̶n̶e̶s̶s̶ ̶o̶r̶ ̶v̶o̶c̶a̶t̶i̶o̶n̶a̶l̶ ̶t̶r̶a̶i̶n̶i̶n̶g̶;̶ *accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.*" (As printed in Horowitz, *supra*, 33 So.Cal.L.Rev. at pp. 269-270, fn. 37.)

To summarize: As introduced on January 21, 1959, Assembly Bill No. 594 "prohibited discrimination against citizens on the basis of race, color, religion, ancestry, or national origin" "(1) in the extension of facilities by 'public or private groups, organizations, associations, business establishments, schools, and public facilities,'" "(2) with respect to the purchase of 'real property,'" and "(3) in obtaining 'the services of any professional person, group or association.'" (Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 266.) Its March 24th version "introduced . . . a broad religious and 'national' exception . . . ." (*Ibid.*) Its March 30th version "eliminated the references to prohibition of discrimination by 'private groups[, etc.]' and with respect to the purchase of real property"; it also "prohibited discrimination . . . by 'all business establishments of every kind whatsoever'; 'all schools of every kind whatsoever,' except religious schools; 'any organization or institution receiving any tax advantage or exemption,' or 'receiving any form of [government] assistance' . . . ; 'business or professional organizations' formed primarily for the advancement of the business or professional interests of the members; and 'any [licensed] professional person.'" (*Id.* at pp. 266-267.) Its April 24th version "more specifically defined" the "religious schools exception" and limited the prohibition of discrimination by "'organization[s] or institution[s] receiving any tax advantage or exemption' . . . or any form of [government] assistance" to "charitable" benefits. (*Id.* at pp. 267-268.) Its May 12th version "changed the prior reference to schools to include 'all schools which primarily offer business or vocational training . . .'"; it changed its coverage from organizations or institutions receiving "'any tax advantage or exemption . . . or any form of'" government

" 'assistance' " to those receiving " 'any direct [government] subvention.' " (*Id.* at pp. 268-269.) Its June 11th version "eliminated a number of the persons or organizations who were prohibited from discriminating, leaving . . . only 'all business establishments of every kind whatsoever,' and 'all schools which primarily offer business or vocational training . . . .' " (*Id.* at p. 269.) Its June 15th version, the final one, "eliminated . . . 'all schools which primarily offer business or vocational training,' " "leaving . . . only 'all business establishments of every kind whatsoever.' " (*Ibid.*)

In view of the background and genesis of section 51, we can arrive at the following conclusions bearing on the meaning of the phrase "business establishments."

First, a comparison of the coverage of section 51 in its present form, which prohibits racial and other discrimination "in all business establishments of every kind whatsoever," with that of the provision in its original form, which prohibited such discrimination in a nonexclusive list of "places of public accommodation," suggests that section 51 is presently broader in its prohibition than it was originally. Because it does not contain a list of any sort, it avoids the constraints that might otherwise be imposed through the kind of superficial *ejusdem generis* analysis in which courts had often indulged. More important, because it speaks of *"business* establishments," it implies, as Professor Horowitz has explained, that it prohibits discrimination in areas of activity encompassing proprietor-patron relationships. (Horowitz, *supra,* 33 So.Cal.L.Rev. at pp. 287-289.) Because it does not even mention "places of *public* accommodation," it implies, as Professor Horowitz has also explained, that it does not prohibit discrimination only in public view. (*Id.* at p. 287.) And because it does not even mention *"places* of public accommodation," it implies, as Professor Horowitz has explained yet again, that it does not prohibit discrimination only at a physical location: it is not bound to "physically located places," but extends as well to "nonphysically-located 'enterprises' or 'organizations.' " (*Ibid.*)

Second, a comparison of the coverage of section 51 in its present form as enacted by the final version of Assembly Bill No. 594, which prohibits racial and other discrimination "in all business establishments of every kind whatsoever," and with that of the provision in the bill's earlier unenacted versions, which prohibited such discrimination by, among other persons and entities, "all . . . private groups, organizations, associations, . . . [and] schools," suggests that section 51 is presently narrower in its prohibition than it might otherwise have been. Because it speaks of "business establishments" and does not even mention any "private" persons or entities, it implies, as Professor Horowitz has explained, that it does not prohibit

discrimination in areas of activity that do not encompass proprietor-patron relationships. (See Horowitz, *supra*, 33 So.Cal.L.Rev. at pp. 289-294.)

Third, a comparison of the coverage of section 51 in its present form as enacted by the final version of Assembly Bill No. 594, which prohibits racial and other discrimination "in . . . business establishments," and with that of the provision in the bill's earlier unenacted versions, which, broadly speaking, prohibited discrimination "by businesses," among other persons and entities, suggests that section 51 is presently different in its prohibition than it might otherwise have been. What might have been material was whether the discriminator was a "business." What is in fact material is whether the discrimination occurs in a "business establishment."

It follows that the phrase "business establishments" in section 51 means areas of activity, whether or not in public view, and whether or not at a physical location, that encompass proprietor-patron relationships.[3]

Therefore, the purpose of section 51 in its present form is like that of the provision in its original form—to prevent racial and other discrimination within its coverage to the benefit of the potential discriminatee and, more generally, the community as a whole. The coverage, however, is now broader than it was previously.

As a result, section 51 in its present form, like the provision in its original form, effectively strikes a balance between the interests of the potential discriminator and those of the potential discriminatee. The balance, however, is now more favorable to the potential discriminatee than it was previously.

But the fact remains, as we stated in *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 500 [86 Cal.Rptr. 88, 468 P.2d 216], and do well to restate here, "there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers."

Over the years, we have considered section 51, but have not given the phrase "business establishments" a consistent or satisfying reading.

Thus, in *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313], we concluded that a commercial developer and

---

[3]See Colley, *Civil Actions For Damages Arising out of Violations of Civil Rights* (1965) 17 Hastings L.J. 189, 197 (implying that the phrase "business establishments" in section 51 means "commercial activit[ies]").

builder of tract housing operated as a "business establishment" within the meaning of section 51 in the selling of the units to buyers. (*Burks* v. *Poppy Construction Co.*, *supra*, 57 Cal.2d at pp. 468-469.) Our reason was to the effect that the words "business" and "establishment" each carried a broad meaning, and that the phrase "business establishments" "was used in the broadest sense reasonably possible." (*Id.* at p. 468.) Our result was sound.[4] The relationship between the commercial developer and builder of tract housing and the buyer in the selling of the units was that of proprietor and patron, since it involved the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings. What we said, and what we did, were consistent with the definition of "business establishments" as areas of activity encompassing proprietor-patron relationships.

In *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427], a majority of the court concluded that a condominium owners association operated as a "business establishment" within the meaning of section 51 in the managing of the development for the owners. (*O'Connor* v. *Village Green Owners Assn.*, *supra*, 33 Cal.3d at pp. 794-796.) The reason was that, in so doing, it "performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders." (*Id.* at p. 796.) The majority's reason was arguably valid.[5] Hence, their result was arguably sound.[6] The relationship between the condominium owners association and the individual owner in the managing of the development was that of proprietor and patron, since it involved the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively nonpersonal and nonsocial dealings, albeit relatively continuous ones. Again, what the majority said, and what the majority did, were arguably consistent with the definition of "business establishments" as areas of activity encompassing proprietor-patron relationships.

In *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212] (hereafter sometimes *Isbister*), a majority of the court concluded that a private nonprofit charitable youth organization—in support of whose position the Boy Scouts appeared as amicus curiae—operated as a "business establishment" within the meaning of section 51 in

---

[4]Notwithstanding the "eliminat[ion]" from section 51 in its present form of "reference[] to prohibition of discrimination . . . with respect to the purchase of real property" that appeared in certain unenacted versions of Assembly Bill No. 594. (Horowitz, *supra*, 33 So.Cal.L.Rev. at pp. 266-267.)

[5]But see *O'Connor* v. *Village Green Owners Assn.*, *supra*, 33 Cal.3d at pages 800-804 (dis. opn. of Mosk, J.).

[6]See footnote 5, *ante.*

the formulating and implementing of membership policies as to members and potential members. (*Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d at pp. 78-86.) The majority's reason seems to have been that the organization's recreational facilities, which included a "gymnasium," "swimming pool," "snack bar," and "craft and games areas" (*id.* at p. 77), looked like one or more of the "places of public accommodation" listed in section 51 in its original form and also in various federal and sister state statutes—all of which spoke of such "places." Their reason was invalid. It was an instance of the old kind of superficial *ejusdem generis* analysis that turned on appearance and not reality. Worse still, it was one that turned on the wrong appearance. For it ignored the fact that it was not section 51 in its original form that was applicable, and certainly not any of the various federal and sister state statutes. Rather, it was section 51 in its present form that governed—a provision different from the former and unique among the latter in speaking of "business establishments." Not only was the majority's reason wanting, their result was unsound. The relationship between the private nonprofit charitable youth organization and the member or potential member in the formulating and implementing of membership policies was not that of proprietor and patron: notwithstanding the payment of dues, it did not, in actuality, involve the providing of goods or services, nongratuitously, for a price or fee; moreover, the dealings in question were not relatively noncontinuous, nonpersonal, and nonsocial. The majority nevertheless held to the contrary. In support, they asserted that the relationship was in fact "of a 'relatively nongratuitous, noncontinuous, nonpersonal, and nonsocial sort.' " (*Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d at p. 81, incorrectly quoting Horowitz, *supra*, 33 So.Cal.L.Rev. at p. 288.) That blinks reality. True, the member or potential member had to pay dues to the organization. But the payment of dues hardly established a proprietor-patron relationship. Especially when the amount was only $3.25 a year. (*Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d at p. 77.) What the majority said, and what the majority did, were inconsistent with the definition of "business establishments" as areas of activity encompassing proprietor-patron relationships.

Similarly, and most recently, in *Warfield* v. *Peninsula Golf & Country Club* (1995) 10 Cal.4th 594 [42 Cal.Rptr.2d 50, 896 P.2d 776] (hereafter sometimes *Warfield*), a majority of the court concluded that a private social club operated as a "business establishment" within the meaning of section 51 in the formulating and implementing of membership policies as to members and potential members. (*Warfield* v. *Peninsula Golf & Country Club, supra*, 10 Cal.4th at pp. 607-623.) In dictum, they set out a number of "factors" that had been deemed "relevant" by various federal and sister state courts in determining whether such a club was covered by various federal and sister

state "public accommodation" statutes, including the "selectivity of the group in the admission of members," which was apparently considered "of prime importance," the "size of the group," the "degree of membership control over the governance of the organization (and particularly the selection of new members)," the "degree to which club facilities are available for use by nonmembers," and "whether the primary purpose served by the club is social or business." (*Id.* at p. 620.) In giving their reason for their conclusion, however, they did not undertake analysis based on this "multipronged standard." (*Id.* at p. 621.) Rather, they simply asserted that "business transactions" which were "conducted regularly on the club's premises with persons who [were] not members of the club" for the members' benefit were "sufficient in themselves to" render the club a "business establishment." (*Ibid.*, italics omitted.) Their reason was invalid. Their result was unsound.[7] Let us assume for argument's sake that the relationship between the private social club and the nonmember in the conducting of some business transaction—say, the offering of tennis equipment at a club shop or tennis lessons by a club professional—was that of proprietor and patron, on the ground that it involved the providing of goods or services nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings. That would be immaterial. For the relationship between the private social club and the member or potential member in the formulating and implementing of membership policies was not that of proprietor and patron: notwithstanding the payment of dues, even substantial dues, it did not, in actuality, involve the providing of goods or services, nongratuitously, for a price or fee; moreover, the dealings in question were not relatively noncontinuous, nonpersonal, and nonsocial. It matters not whether the private social club, in the abstract, could be called a "business." To the extent that it occupied an area of activity encompassing patron-proprietor relationships, it operated as a "business establishment." But only to that extent. As we stated in *Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493, 500, "there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers." Again, what the majority said, and what the majority did, were inconsistent with the definition of "business establishments" as areas of activity encompassing proprietor-patron relationships.[8]

At the end of the day, the question comes down to this: What do we do with section 51, on the one side, and *Isbister* and *Warfield*, on the other? The

---

[7]So I believe now. (But see *Warfield* v. *Peninsula Golf & Country Club, supra,* 10 Cal.4th at pp. 630-632 (conc. opn. of Mosk, J.).)

[8]See footnote 7, *ante.*

answer must be: Save the provision and overrule the decisions. Otherwise, we shall undermine the antidiscrimination policy that section 51 expresses in the general area of relationships between private persons and entities by undermining its coherence. This we cannot and must not allow.

In conclusion, the law is, and should be recognized to be, as follows: The phrase "business establishments" in section 51 means areas of activity encompassing proprietor-patron relationships—which involve the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings.

## II

Turning from the construction of section 51 to its application, we must now determine whether or not the provision covers the Boy Scouts in the formulating and implementing of membership policies as to members or potential members.

At the threshold, we are presented with this question: On what level of the Boy Scouts as an organization do we focus—e.g., the local troop; the regional council, such as the Mount Diablo Council itself; or the national body?

It turns out, however, that, no matter what answer we may happen to give, we arrive at the same conclusion.

Section 51 does not cover the Boy Scouts, at any level of the organization, in the formulating or implementing of membership policies as to members or potential members. That is because at no level does it operate in that regard as a "business establishment"—that is to say, at no level does it occupy in that regard an area of activity encompassing proprietor-patron relationships. The record on appeal is unequivocal. For the relationship between the Boy Scouts and the member or potential member in the formulating and implementing of membership policies, at whatever level of the organization, does not, in actuality, involve the providing of goods or services, nongratuitously, for a price or fee, notwithstanding the payment of dues; moreover, the dealings in question are not relatively noncontinuous, nonpersonal, and nonsocial dealings, but quite the opposite.[9]

This, of course, does not negate the possibility that section 51 may cover the Boy Scouts, at some level of the organization, in some other regard.

[9] In order to prevent subterfuge, we would doubtless have to hold that the Boy Scouts operated as a "business establishment" in the formulating and implementing of membership policies as to members or potential members if its sole purpose or effect was to limit the class of persons to whom it would provide goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings. (Cf. *Daniel* v.

Indeed, the record on appeal shows that possibility to be a fact. For example, the provision covers the Mount Diablo Council in at least one respect. The council operates as a "business establishment" in the selling of camping equipment and similar merchandise to the general public at a "Scout Shop" in San Francisco. In so doing, it occupies an area of activity encompassing proprietor-patron relationships. Without doubt, the relationship between the council and the customer involves the providing of goods or services, nongratuitously, for a price or fee, in the course of relatively noncontinuous, nonpersonal, and nonsocial dealings.

But the fact that section 51 may, and in fact does, cover the Boy Scouts insofar as it is a "business establishment" to the extent that it occupies an area of activity encompassing proprietor-patron relationships *in the selling of camping equipment and similar merchandise to the general public* does not mean that it does, or even can, cover the organization insofar as it is not a "business establishment" to the extent that it does not occupy an area of activity encompassing proprietor-patron relationships *in the formulating or implementing of membership policies as to members or potential members*— with which alone we are concerned here.

### III

The majority come to conclusions identical to those set out, viz., that section 51 does not cover the Boy Scouts in the formulating or implementing of membership policies as to members or potential members at any level of the organization, but does cover the Mount Diablo Council in the selling of camping equipment and similar merchandise to the general public at its "Scout Shop" in San Francisco.

The majority, however, do not engage in identical analysis—or, despite their many pages, in any substantial analysis as an alternative. They do little more than attempt to distinguish *Isbister* and *Warfield*.[10] They do so essentially by stating that the Boys' Club of Santa Cruz and the Peninsula

*Paul* (1969) 395 U.S. 298, 301-302 [89 S.Ct. 1697, 1699, 23 L.Ed.2d 318] [holding to such effect as to a "club" under the provisions for "place[s] of public accommodation" subject to title II of the Civil Rights Act of 1964 (78 Stat. 243, 42 U.S.C. § 2000a et seq.)].) We could make no such holding here: The condition is not satisfied.

[10]And state broadly, and erroneously, in dictum that section 51 "clearly applies to any type of for-profit commercial enterprise, and to nonprofit entities . . . whose purpose is to serve the business or economic interests of its owners or members . . . ." (Maj. opn., *ante*, at pp. 696-697, fn. omitted.) As explained, the provision applies only to the extent that any such "enterprise" or "entity" occupies an area of activity encompassing proprietor-patron relationships.

Golf & Country Club are different from the Boy Scouts. Perhaps true.[11] But unquestionably trivial. They apparently have as their object to salvage *Isbister* and *Warfield* at any cost. Neither decision is worth the effort. In large part, each merely purports to apply the phrase "business establishments" in section 51 to the peculiar facts presented, and then asserts that its words are broad enough to reach the entity in question. Neither construes the phrase, except indirectly through the former's superficial *ejusdem generis* analysis and the latter's inapt "multipronged standard" and conclusory "business transactions" test. In this respect, however, the majority pass them over virtually in silence: they do not bring to bear either analysis or standard or test, and put nothing in their place. By proceeding as they do, they render their own discussion vague in its outline and ad hoc at its core, and hence fail to give guidance for lawful conduct outside of court or for principled decisionmaking within. In the end, they tell us only that the Boys' Club of Santa Cruz, and the Peninsula Golf & Country Club operate as "business establishments," and that the Boy Scouts do not. That is not nearly enough.

IV

For the reasons stated above, I join with my colleagues in affirming the judgment of the Court of Appeal.

**KENNARD, J.,** Concurring.—I join the majority in holding that the Boy Scouts of America is not a "business establishment" whose membership and policy decisions fall within the reach of California's Unruh Civil Rights Act. (Civ. Code, § 51 (hereafter sometimes the Act).) The Chief Justice in his majority opinion bases that conclusion on "the language, legislative history, and purpose of the Unruh Civil Rights Act, and this court's prior decisions interpreting the Act." (Maj. opn., *ante*, at p. 700.) Not mentioned in that opinion, however, is a rule of statutory construction that provides additional support for our holding in this case: An ambiguous statutory term should be construed, if possible, to avoid constitutional difficulties.

The Act uses the ambiguous term "business establishment." A construction of that term as excluding the membership decisions of the Boy Scouts avoids grave constitutional difficulties posed by the First Amendment protections of freedom of speech and of association. Stated more specifically, it is highly doubtful that a state may, consistent with the First

---

[11]Appearing in *Isbister* as amicus curiae, the Boy Scouts evidently did not consider itself different from the Boys' Club of Santa Cruz, Inc. Neither did the majority therein, notwithstanding their assertion that they "reserve[d] judgment" on the issue. (*Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d at p. 81, fn. 8.)

Amendment guarantees of freedom of speech and of association, compel an organization like the Boy Scouts to accept as a member someone who actively opposes one of that organization's basic precepts and who seeks membership in order to promote those contrary views. Accordingly, to avoid conflict with the First Amendment to the federal Constitution, the term "business establishment," as used in the Act, should be construed as excluding the membership decisions of the Boy Scouts.

I

The First Amendment to the federal Constitution provides: "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the government for redress of grievances." By its terms, the First Amendment imposes a restriction directly on Congress; because of the due process clause of the Fourteenth Amendment, however, no *state* may violate the rights that the First Amendment protects. (U.S. Const., 14th Amend.; *Near* v. *Minnesota* (1931) 283 U.S. 697, 707 [51 S.Ct. 625, 628, 75 L.Ed. 1357].)

"The First Amendment to the federal Constitution prohibits government action abridging freedom of speech and assembly. The right to freely express one's beliefs or ideas, unpopular as they may be, is essential to 'nearly every other form of freedom.' (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 327 [82 L.Ed. 288, 293, 58 S.Ct. 149].) 'Full and free discussion has indeed been the first article of our faith. We have founded our political system on it.' (*Dennis* v. *United States* (1951) 341 U.S. 494, 584 [95 L.Ed. 1137, 1191, 71 S.Ct. 857].) Our nation's historic vigilance against attempts to curtail the expression of speech 'has been the one single outstanding tenet that has made our institutions the symbol of freedom and equality' (*id.* at p. 585 [95 L.Ed. at p. 1191]) and 'sets us apart from totalitarian regimes' (*Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 1134-1135, 69 S.Ct. 894])." (*Planned Parenthood Shasta-Diablo, Inc.* v. *Williams* (1995) 10 Cal.4th 1009, 1031 [43 Cal.Rptr.2d 88, 898 P.2d 402] (dis. opn. of Kennard, J.).)

The First Amendment guarantees the right of *groups and their members to associate for expressive purposes*: "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. [Citation.] According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. [Citations.] Consequently, we have long understood as implicit in

the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 622 [104 S.Ct. 3244, 3252, 82 L.Ed.2d 462].)

The First Amendment also guarantees *the speaker's right to control the message being conveyed*: " 'Since *all* speech inherently involves choices of what to say and what to leave unsaid,' [citation], one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say,' [citation]. . . . Indeed this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid . . . . Its point is simply the point of all speech protection, which is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." (*Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 573-574 [115 S.Ct. 2338, 2347-2348, 132 L.Ed.2d 487], original italics.)

## II

In this case, an organization has excluded an individual who advances views contrary to those of the organization. The trial court found the Boy Scouts of America to be an organization whose activities are "overwhelmingly expressive": The group promotes camping and other outdoor activities as a means of building character, fostering citizenship, and developing mental, moral, and physical fitness. Membership in the Boy Scouts is open to boys of all races and religions. But as the trial court expressly found, the official position of the Boy Scouts is that "homosexuality is immoral and incompatible with the Boy Scout Oath and Law."

Plaintiff was a member of a Boy Scout troop and achieved the highest possible rank, that of Eagle Scout; his scout membership ended automatically when he turned 18 years old. Several months later, he was featured in an Oakland Tribune article on gay teenagers. The newspaper reported that plaintiff had a "gay social life" while he was still in high school, that he had been involved with the Bay Area "gay youth underground," and that he considered himself to be "a gay youth activist." Shortly thereafter, plaintiff filed an application with the Mount Diablo Council of the Boy Scouts of America to attend the 1981 Boy Scouts of America National Jamboree. The council's executive director, Quentin Alexander, rejected the application because plaintiff was not a member of any Mount Diablo troop.

A few days later, plaintiff telephoned Alexander and inquired about the status of his application. Alexander told him that only active scouts could

attend the jamboree and that adults were eligible to attend only if they were scoutmasters or assistant scoutmasters, that is, the adult leaders of a troop. Plaintiff responded that "in that case" he would "file an application" for assistant scoutmaster. When Alexander declined to accept the application, plaintiff asked, "is it because of my homosexuality?" Alexander admitted that it was, but proposed to meet with plaintiff to discuss the matter. In that meeting, Alexander reports plaintiff as saying that he specifically wanted to be in the scouts "because he so firmly believed personally in a homosexual lifestyle that there was . . . not anything wrong with it, and he wanted to make sure that other kids understood that."

## III

Were we to hold that the membership decisions of the Boy Scouts of America are subject to regulation under the Unruh Civil Rights Act, the organization would have a compelling argument that requiring it to accept plaintiff, or anyone else who espouses views contrary to its guiding precepts, violates the First Amendment rights of expressive association and free speech enjoyed by the organization and its members.

This case is unlike those in which the United States Supreme Court has rejected First Amendment challenges to state public accommodation laws by organizations seeking to exclude individuals on grounds unrelated to views advanced by the organizations. (See *New York State Club Assn.* v. *New York City* (1988) 487 U.S. 1, 13 [108 S.Ct. 2225, 2234, 101 L.Ed.2d 1] [rejecting facial challenge to city ordinance]; *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club* (1987) 481 U.S. 537, 549 [107 S.Ct. 1940, 1948, 95 L.Ed.2d 474] [no First Amendment violation in applying California's Act to require admission of women to California Rotary Clubs]; *Roberts* v. *United States Jaycees, supra,* 468 U.S. 609, 627 [104 S.Ct. 3244, 3254-3255] [no violation of right to expressive association in enforcing Minnesota Human Rights Act to compel Jaycees to admit women members].) In each case, the high court stressed that the law that withstood constitutional scrutiny either "require[d] no change in the [organization's] creed" and "impose[d] no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members" (*Roberts, supra,* 468 U.S. 609, 627 [104 S.Ct. 3244, 3254]), erected no obstacle to "a club seek[ing] to exclude individuals who do not share the views that the club's members wish to promote" (*New York State Club Assn., supra,* 487 U.S. 1, 13 [108 S.Ct. 2225, 2234]), or did "not require the clubs to abandon or alter" any expressive activities (*Bd. of Dirs. of Rotary Int'l, supra,* 481 U.S. 535, 548 [107 S.Ct. 1940, 1947]). By contrast, here plaintiff *does not share* the views promoted by the organization he seeks to join; to require the Boy Scouts to

accept him as an assistant scoutmaster would *restrict the organization's ability to exclude an individual with a contrary ideology or philosophy.*

On point is *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra,* 515 U.S. 557. There, the United States Supreme Court unanimously held that the Massachusetts courts could not apply that state's antidiscrimination law to compel the organizers of an annual St. Patrick's Day parade to admit a contingent of gay, lesbian, and bisexual marchers. The group, "GLIB," had been formed for the express purpose of marching under its own banner in the parade "in order to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants." (*Id.* at p. 570 [115 S.Ct. at pp. 2345-2346].) Even though the parade lacked any "narrow, succinctly articulable message" (*id.* at p. 569 [115 S.Ct. at p. 2345]), enforcement of the antidiscrimination law to require the parade organizers to include the GLIB marchers, the high court said, would violate the organizers' right of free speech and their right of expressive association.

*Hurley* pointed out that to require inclusion of the GLIB contingent as parade marchers would violate the parade organizers' right of free speech because it would force the organizers to alter the message they wished their parade to convey. (*Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra,* 515 U.S. 557, 572-573 [115 S.Ct. 2338, 2346-2347].) "Although the state courts spoke of the parade as a place of public accommodation [citation], once the expressive character of both the parade and the marching GLIB contingent is understood, it becomes apparent that the state courts' application of the statute had the effect of declaring the [organizers'] speech itself to be the public accommodation. Under this approach any contingent of protected individuals with a message would have the right to participate in [the organizers'] speech, so that the communication produced by the private organizers would be shaped by all . . . . But this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." (*Id.* at p. 573 [115 S.Ct. at p. 2347].) The court emphasized: "While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." (*Id.* at p. 579 [115 S.Ct. at p. 2350].)

As an alternative basis for its decision, *Hurley* held that compelling GLIB's inclusion in the parade would violate the parade organizers' right of expressive association: "Assuming the parade to be large enough and a source of benefits (apart from its expression) that would generally justify a

mandated access provision, GLIB could nonetheless be refused admission as an expressive contingent with its own message *just as readily as a private club could exclude an applicant whose manifest views were at odds with a position taken by the club's existing members."* (*Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra,* 515 U.S. 557, 580-581 [115 S.Ct. 2338, 2350-2351], italics added.)

The high court's unanimous decision in *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra,* 515 U.S. 557, holding that an organization's right of free speech includes total control over the content of its message and that an organization's right of expressive association allows it to exclude applicants with "manifest views" at odds with those of the organization, is binding on this court. The breadth of the *Hurley* decision raises grave doubts whether California's Legislature could ever constitutionally enact, or this court enforce, a law requiring an organization like the Boy Scouts, whose mission is to instill in boys a certain philosophy of moral behavior, to admit an individual who advances contrary views.[1]

## IV

Where, as here, enforcement of a statute would raise serious questions regarding its constitutionality, our rules of statutory construction require us

---

[1] I am not persuaded otherwise by a recent decision of the Appellate Division of the New Jersey Superior Court. In that case, a two-judge majority held that the First Amendment poses no impediment to enforcement of New Jersey's public accommodation statute to preclude the Boy Scouts from excluding a 20-year-old university student who had publicly avowed his homosexuality and served as co-president of the Lesbian/Gay Alliance on his college campus. (*Dale* v. *Boy Scouts of America* (1998) 308 N.J. Super. 516 [706 A.2d 270].)

Among the *Dale* majority's reasons for its holding was its rejection of the proposition "that the [Boy Scouts of America] has a constitutional privilege of excluding a gay person when the sole basis for the exclusion is the gay's exercise of his own First Amendment right to speak honestly about himself." (*Dale* v. *Boy Scouts of America, supra,* 706 A.2d at p. 293. But when an individual seeks to use state power to force a private organization to accept that individual as a member, and the individual's views are diametrically opposed to those of the organization, the First Amendment rights at issue are those of the organization and its members, not those of the applicant. Accordingly, the critical issue, which the *Dale* majority never considered, was this: Whether granting the plaintiff the relief he sought would violate the First Amendment right of the Boy Scouts, by means of its policy and membership decisions, to choose the content of the organization's own message. (See *id.* at pp. 294, 295 (conc. and dis. opn. of Landau, J.A.D.) [concluding that requiring the Boy Scouts to grant the plaintiff a leadership position violated the organization's right of expressive association: "If their perception of the immorality of homosexuality is in fact an important part of the Boy Scouts' institutional message to young Scouts, what Jim Dale openly professes and exemplifies clearly flies in the face of that view. When we force the Boy Scouts to permit him to serve as a volunteer leader, we force them equally to endorse his symbolic, if not openly articulated, message."].)

to construe the statute, if possible, in a manner that avoids such difficulties. As this court observed recently: " 'If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers.' " (*People* v. *Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628], quoting *Miller* v. *Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297]; accord, *Young* v. *Haines* (1986) 41 Cal.3d 883, 898 [226 Cal.Rptr. 547, 718 P.2d 909].) The United States Supreme Court follows the same practice in construing acts of Congress. (*United States* v. *Delaware & Hudson Co.* (1909) 213 U.S. 366, 407-408 [29 S.Ct. 527, 535, 53 L.Ed. 836] ["if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity."]; *United States* v. *Security Industrial Bank* (1982) 459 U.S. 70, 78 [103 S.Ct. 407, 412, 74 L.Ed.2d 235]; *NLRB* v. *Catholic Bishop of Chicago* (1979) 440 U.S. 490, 499 [99 S.Ct. 1313, 1318, 59 L.Ed.2d 533].)

Thus, I agree with Professor William N. Eskridge of Georgetown University Law Center that the high court's decision in *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, *supra*, 515 U.S. 557, dictates a cautious approach to construing antidiscrimination laws. As he puts it: "General antidiscrimination statutes will not be read expansively, beyond their clear application, when the broad reading would directly burden protected First Amendment rights. Such a clear statement rule not only would ameliorate clashes between nondiscrimination and free speech norms but would appropriately place the burden on the legislature to consider First Amendment values when it adopts antidiscrimination laws." (Eskridge, *A Jurisprudence of "Coming Out": Religion, Homosexuality, and Collisions of Liberty and Equality in American Public Law* (1997) 106 Yale L.J. 2411, 2462-2463.)

Here, by construing the term "business establishment" in the Unruh Civil Rights Act as not encompassing the membership and policy decisions of the Boy Scouts, we avoid a statutory construction that could bring the act's antidiscrimination provisions into conflict with the free speech and expressive association rights that the Boy Scouts and its members have under the First Amendment.

CONCLUSION

What the First Amendment protects is not just "free thought for those who agree with us but freedom for the thought that we hate." (*United States* v. *Schwimmer* (1929) 279 U.S. 644, 655 [49 S.Ct. 448, 451, 73 L.Ed. 889] (dis. opn. of Holmes, J.).) "The essence of our First Amendment's guarantee of freedom of expression . . . is the right of anyone to speak out. '[F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.' (*West Virginia Bd. of Ed.* v. *Barnette* (1943) 319 U.S. 624, 642 [87 L.Ed. 1628, 1639, 63 S.Ct. 1178, 147 A.L.R. 674].).)" (*Planned Parenthood Shasta-Diablo, Inc.* v. *Williams, supra,* 10 Cal.4th 1009, 1039 (dis. opn. of Kennard, J.).)

Could the NAACP be compelled to accept as a member a Ku Klux Klansman? Could B'nai B'rith be required to admit an anti-Semite? If the First Amendment protects the membership decisions of these groups, must it not afford the same protection to the membership decisions of the Boy Scouts?

I have grave doubts that the First Amendment permits the state to compel an organization like the Boy Scouts to accept as members those who espouse contrary views. For this reason, as well as those expressed in the majority opinion, I agree that the Boy Scouts of America is not a "business establishment" whose membership and policy decisions are within the reach of the Unruh Civil Rights Act.

**WERDEGAR, J.**—I concur in the judgment. I write separately to express some concerns about this court's Unruh Civil Rights Act jurisprudence. (Civ. Code, § 51, hereafter sometimes the act or section 51.)

The Unruh Civil Rights Act, which applies to "all business establishments of every kind whatsoever" (Civ. Code, § 51), was not the Legislature's first attempt to codify the state's policy against arbitrary discrimination by persons and entities serving the public. The first such attempt, a predecessor of section 51, granted the right to "full and equal accommodations, advantages, facilities, and privileges" in a number of specifically designated enterprises (e.g., "inns, restaurants, hotels, eating houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, [and] public convey-. ances"), as well as "all other places of public accommodation or amusement . . . ." (Former Civ. Code, § 51, added by Stats. 1905, ch. 413, § 1, p. 553, amended by Stats. 1923, ch. 235, § 1, p. 485.) As the court explains, in

apparent response to a number of appellate court decisions concluding the statute did not apply to a private cemetery, a dentist's office, or a private school (see the cases cited in the maj. opn., *ante*, at p. 687), the Legislature in 1959 revised and expanded the prior law by enacting the current version of section 51.

As initially introduced, the bill that became the present act would have extended to "all public or private groups, organizations, associations, business establishments, schools, and public facilities," as well as to the "purchase [of] real property" and "the services of any professional person, group or association." (Assem. Bill No. 594 (1959 Reg. Sess.), as introduced Jan. 21, 1959, and as cited in *Warfield* v. *Peninsula Golf & County Club* (1995) 10 Cal.4th 594, 608 [42 Cal.Rptr.2d 50, 896 P.2d 776].) Evidently unable to achieve consensus on the aforementioned categories of facilities or specified entities, or on any particular combination thereof, the Legislature settled on the language we have today. In the ensuing years, it has been this court's challenging task to apply that language—"business establishments of every kind *whatsoever*" (Civ. Code, § 51, italics added)—in a variety of contexts. Today we do so in the context of the Boy Scouts of America.

Virtually everyone knows something of the scouts. The image of youths pursuing outdoor and patriotic activities is entrenched in our culture. Sharing this background, many readers of the court's opinion will intuitively accept its conclusion that the Boy Scouts is not a "business establishment[]" (Civ. Code, § 51) subject to the act. Because the conclusion may not be surprising, the analysis that produced it may not excite much interest outside of courts and law schools, even though the case itself has attracted some attention. Nevertheless, the reasons the court gives for its decision today have important social ramifications. Organizations, and the people they affect, are entitled to know with a fair degree of certainty whether the law applies to them or not. I fear, however, that our jurisprudence, including today's decision, fails to provide useful guidance. I am further concerned that, without additional legislative input, predictability may remain an elusive goal.

This case arose because our past decisions supported a respectable argument that the Boy Scouts is a "business establishment[]." While we do not normally think of the scouts as an organization conducted for profit or as having a place of business, neither attribute has been required of a "business establishment[]" under our decisions. We have held the act applies to nonprofit (*O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790, 795-796 [191 Cal.Rptr. 320, 662 P.2d 427]) and charitable organizations (*Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 76, 84 [219

Cal.Rptr. 150, 707 P.2d 212]), as well as to entities without fixed locations (*Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463, 468-469 [20 Cal.Rptr. 609, 370 P.2d 313]). We also have held the act applicable to ostensibly private clubs. (*Warfield* v. *Peninsula Golf & Country Club, supra*, 10 Cal.4th at p. 630.) That the scouting organization involved in this case, Mount Diablo Council of the Boy Scouts of America, happens to operate a public retail store invited analogy to the country club in *Warfield* v. *Peninsula Golf & Country Club*, which we held was a "business establishment" "because it engaged in a variety of 'business transactions' with nonmembers on a regular basis . . . ." (*Ibid.*) Furthermore, our decision in *Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d 72, suggested the act would apply to "broad-based nonprofit community service organizations" (*id.* at p. 79) similar to the Boy Scouts, even though the court expressly reserved judgment on the scouts, themselves (*id.* at p. 84, fn. 14).

It was these decisions that led the trial court to conclude the Boy Scouts is a "business establishment[]" subject to the act. While the court today rejects that conclusion, it was not irrational or irreconcilable with precedent: Our prior decisions pointed to such a result. Nevertheless, our task in the first instance is, as always, to construe the statute and, if possible, to implement the intent of the Legislature. Because it seems highly unlikely the Legislature intended the act to apply to the scouts, I concur in the judgment. I write separately to point out that the court's rationale for excluding the scouts from the act introduces three new elements into our Unruh Civil Rights Act jurisprudence.

First, the court suggests an organization can be broken down into its constituent functions for the purpose of deciding whether the act applies. Thus, the majority concludes that *"with regard to its membership policies and decisions,"* defendant is not a business establishment within the meaning of the act (maj. opn., *ante*, at p. 673, italics added; see also *id.* at pp. 685, 696, 698-699), while strongly disavowing any implication the act might permit discrimination in the Boy Scout's retail stores (*id.* at pp. 700-701). This piecemeal mode of analysis, however, seems at odds with the language of the act, which refers simply to "business establishments" (Civ. Code, § 51), not to the "business *functions* of establishments." This approach also promises further controversy. By implying the act will now be applied on a function-by-function basis, rather than to whole "establishments" (*ibid.*), the court multiplies the number of abstract objects to which the act in theory might or might not apply and, thus, the occasions for litigation. Under this state of affairs, few organizations will have an incentive *not* to litigate their status under the act.

Second, the court reasons that an organization may sell goods to the general public without becoming a "business establishment[]," so long as it

does not sell the "primary incidents and benefits of membership in the organization." (Maj. opn., *ante*, at p. 700.) In support, the court cites *Warfield* v. *Peninsula Golf & Country Club, supra*, 10 Cal.4th 594; but in *Warfield* we employed no such distinction. Indeed, to have drawn such a distinction would not have supported the outcome in that case. In *Warfield*, the principal "incident of membership" in the country club was the right to participate freely in its social activities—something the club did not sell to the general public.

Third, the court seems to imply that an organization may not qualify as a "business establishment[]" in part because it is not a public accommodation. (See maj. opn., *ante*, at pp. 697-698.) The implication arises from the manner in which the court distinguishes *Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d 72. In *Isbister,* the court essentially held that all public accommodations were "business establishments" under the act. The court based this conclusion on the assumption the act was intended to apply more broadly than its statutory predecessor, which had expressly applied to " 'places of public accommodation.' " (40 Cal.3d at p. 83.) *Isbister*'s conclusion can fairly be criticized on the ground that the term used in the present act—"business establishment[]"—neither refers to nor obviously includes all public accommodations. But assuming for the sake of argument *Isbister* correctly held all public accommodations are business establishments, it still does not follow that *the failure* of an organization to be "the functional equivalent of a traditional place of public accommodation" (maj. opn., *ante*, at p. 697) has a negative bearing on the act's applicability. To quote *Isbister*, the act "was intended *at a minimum* to continue the coverage of 'public accommodations.' " (40 Cal.3d at p. 83, italics added.)

After three decades of decisions, including today's, addressing the question whether particular entities are "business establishments" subject to the act,[1] a competent attorney in many foreseeable cases still would not be able to advise a client with a reasonable degree of certainty whether the act

---

[1]See *Warfield* v. *Peninsula Golf & Country Club, supra*, 10 Cal.4th 594 (country club a "business establishment"); *Isbister* v. *Boys' Club of Santa Cruz, Inc., supra*, 40 Cal.3d 72 (nonprofit recreational facility a "business establishment"); *O'Connor* v. *Village Green Owners Assn., supra*, 33 Cal.3d 790 (homeowners association a "business establishment"); *Burks* v. *Poppy Construction Co., supra*, 57 Cal.2d 463 (real estate seller a "business establishment"). See also *Harris* v. *Mothers Against Drunk Driving* (1995) 40 Cal.App.4th 16 [46 Cal.Rptr.2d 833] (reversing summary judgment for expressive organization and finding a question of fact as to whether it is a "business establishment"); *Rotary Club of Duarte* v. *Board of Directors* (1986) 178 Cal.App.3d 1035 [224 Cal.Rptr. 213] (civic organization a "business establishment"); *Curran* v. *Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712 [195 Cal.Rptr. 325, 38 A.L.R.4th 607] (rejecting on demurrer the argument that the Boy Scouts are not a "business establishment"); *Pines* v. *Tomson* (1984) 160

applies. In large part this is a result of the 1959 Legislature's failure to define the term. When legislative consensus fails on such a fundamental question as the reach of an antidiscrimination law, however, to look to courts for a clear solution to the underlying problem may be unrealistic. The exercise of supplying definitions for undefined statutory terms is not a comfortable one for judges, who generally would rather apply law than make it. Forced to supply definitions, cautious judges tend to prefer definitions more vague than precise, because the former tend to be more difficult to refute. The more precise a definition, the more vulnerable it is to the argument that, "if the Legislature had meant *that*, it could easily have said so." The most cautious way of all for courts to proceed in supplying meaning to a statutory term is to offer, in place of a definition, an "approach," consisting of a universe of considerations to be weighed and balanced. So long as the outcomes of cases decided in this manner do not seem inherently implausible, the Legislature has little incentive to take on the politically difficult task of clarifying an important but controversial statute. This way of proceeding, however, is also the most productive of litigation and the least helpful to those who must attempt to comply with the law. Regrettably, this is the path our decisions seem likely to follow in the absence of clearer statutory guidance.

**BROWN, J.**—I concur in the judgment.

In my view, however, the majority's analysis cannot sustain the result. Like Justice Werdegar, I find that our Unruh Civil Rights Act jurisprudence, including today's decision, fails to provide useful guidance in determining the act's coverage and that predictability in its application remains elusive. To put it bluntly, the law is a mess. In a state as marvelously diverse as California, the rules regarding discrimination should not develop ad hoc. Nevertheless, our prior decisions have almost universally failed to formulate a coherent and comprehensive interpretation of "business establishment." This vice did not become pernicious until recently because the results appeared consistent with legislative intent to prohibit discrimination by those engaged in commercial activity regardless of its form. (See, e.g., *Burks* v. *Poppy Construction Co.* (1962) 57 Cal.2d 463 [20 Cal.Rptr. 609, 370 P.2d 313] [Unruh Civil Rights Act applies to sale of real property notwithstanding lack of fixed place of business].) Beginning at least with *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212], however, the lack of analytical substance began to take its toll, and the law is now desperately in need of critical reexamination.

Cal.App.3d 370 [206 Cal.Rptr. 866] (nonprofit religious publisher of Christian Yellow Pages a business establishment).

In his concurrence, Justice Mosk has successfully undertaken this task, and I fully endorse his statutory analysis and the conclusions which flow from it. In discussing the likely scope of "business establishment," Professor Horowitz noted the Legislature had failed to define this pivotal phrase. Nevertheless, considering the language contained in predecessor public accommodations statutes replaced by the Unruh Civil Rights Act, the choice to declare the principle of nondiscrimination "in terms of 'business' relationships seems to indicate . . . that the principle should be restricted to a broad category of relationships in which the 'establishment' offers its facilities for compensation, and in which the relationship with the patron is relatively noncontinuous, and in which personal and social aspects of the relationships are relatively insignificant." (Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application* (1960) 33 So.Cal.L.Rev. 260, 288-289.)

Given the Legislature's clear focus on discrimination arising in the context of commercial activities, Horowitz concluded "[m]embership clubs or organizations, *e.g.*, country clubs owned by and operated for the benefit of the members, [which] should be held not to fall within the scope of the statutory principle, because the relationship between discriminator and discriminatee is essentially continuous, personal, and social." (Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application, supra,* 33 So.Cal.L.Rev. at pp. 289-290, fn. omitted.) Likewise, coverage of nonprofit organizations would turn on whether the relationship between the establishment and other persons were "of a gratuitous, continuous, personal, and social sort . . . ." (*Id.* at p. 290.)

Justice Mosk's definition of business establishment faithfully distills the valuable insights of Professor Horowitz on which this court has frequently relied and provides a comprehensive, and comprehensible, standard. Doubtless, his conclusions require the overruling of *Isbister* v. *Boys' Club of Santa Cruz, Inc., supra,* 40 Cal.3d 72, and *Warfield* v. *Peninsula Golf & Country Club* (1995) 10 Cal.4th 594 [42 Cal.Rptr.2d 50, 896 P.2d 776]. That necessity should not call into question the soundness of the standard; it simply reflects how far our jurisprudence has strayed from the plain meaning of the statute and apparent legislative intent.

This explication of the Unruh Civil Rights Act also properly recognizes a distinction between an organization's formulation and implementation of membership policies and its commercial activities. Such recognition is not only consistent with the statutory language and legislative intent but, for the reasons cogently expressed by Justice Kennard in her concurrence, imperative when those policies implicate expressive association and free speech.

Any definition of business establishment that failed to make such an accommodation would raise serious constitutional questions as to application of the act.